**UNITED STATES of America, Appellee,**

v.

**Ronald DONALDSON,
Defendant-Appellant.**

**No. 645, Docket 85–1363.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 7, 1986.

Decided June 20, 1986.

Richard A. Reeve, Asst. Federal Public Defender, D.Conn., New Haven, Conn. (Thomas G. Dennis, Federal Public Defender, D. of Conn., Nancy Stoner, Law Student Intern, of counsel), for defendant-appellant.

Jeremiah F. Donovan, Asst. U.S. Atty., D.Conn., New Haven, Conn. (Stanley A. Twardy, Jr., U.S. Atty., D.Conn., New Haven, Conn., of counsel), for appellee.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Ronald Donaldson appeals from his conviction of one count of harboring or concealing a fugitive in violation of 18 U.S.C. § 1071 (1982), following a jury trial before Judge Eginton. The principal issue raised is whether *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), requires us to hold that the warrantless search of Donaldson's apartment was illegal. Because we believe that the search was incident to Donaldson's valid arrest and that Donaldson's other arguments are without merit, we affirm.

## BACKGROUND

Our description of the facts relies upon the parties' Joint Proposed Findings of Fact. On June 28, 1984, Special Agent Macrino of the United States Secret Service began an investigation into the passing of a counterfeit twenty-dollar note at a Bridgeport service station. The station's attendant was suspicious after receiving the note as payment for two dollars' worth of gasoline, and he copied the license plate number of the vehicle on the back of the bill.

The license plate was registered to Frank Spetrino ("Spetrino's father") of 227 Grove Street, Bridgeport, father of Frank Spetrino III ("Spetrino"). The building at 225–229 Grove Street is a three-story, three-family residence. Each apartment occupies a single floor and is assigned a separate street number. The Spetrino apartment, 227 Grove Street, was on the second floor; the third floor apartment, 229 Grove Street, was occupied by Donaldson.

Upon arriving at the Spetrino home on June 29, the Secret Service agents were greeted at the door by Spetrino's father, who told them that his son was not home. Spetrino's father stated that Spetrino had been using the vehicle on the day before— the day the note was passed. Thereafter, the agents who had been watching the rear of the building encountered Spetrino as he attempted to leave the premises through a back door.

Agent Macrino identified himself to Spetrino, explained his investigation, and asked Spetrino to accompany the agents to the Bridgeport Police Department, which Spetrino agreed to do. During the interview at the police department, Spetrino admitted that he had passed the counterfeit bill, claiming to have received it from Thomas Palmieri of Naugatuck. Spetrino told the agents that Palmieri had printed a large quantity of twenty-dollar notes, which Spetrino and others had used to buy narcotics, and that Palmieri was planning to print another large batch the next morning. After agreeing to meet Agent Macrino the following morning, Spetrino was allowed to go home.

Thomas Palmieri was well known to the Secret Service agents. A printer by trade, he previously had been convicted of manufacturing counterfeit currency. The agents maintained an all-night surveillance of Palmieri's residence on June 29.

On June 30, Spetrino went with Agent Macrino to the Bridgeport Police Department. There Spetrino made a telephone call to Palmieri, but the conversation was vague and inconclusive for investigative purposes. Spetrino then told Agent Macrino that he had to go to a nearby methadone clinic, and Agent Macrino agreed to wait until Spetrino had picked up his methadone and returned.

Shortly after Spetrino had left Agent Macrino to visit the clinic, Palmieri walked out of his house in Naugatuck, approached the Secret Service surveillance van, and peered directly into the van, ending any possibility of surreptitious surveillance. The parties differ as to whether Palmieri's discovery should have led the agents to believe that Spetrino had tipped off Palmieri.

After an hour passed and Spetrino had not reappeared, Agent Macrino began looking for him without success. On June 30, July 1, and July 2, Agent Macrino made numerous calls to the Spetrino residence. Each time he called, Spetrino's father told him that Spetrino was not at home and that he had not seen him.

On July 2, Agent Macrino filed a complaint describing his investigation of Spetrino and, at approximately 3:00 p.m., obtained a warrant for Spetrino's arrest. At approximately 4:00 p.m., Agent Macrino along with four other agents of the Secret Service initiated a surveillance at 225–229 Grove Street. Sometime after 4:00 p.m., Agent Gardner observed Spetrino's father drive to the front door of 225–229 Grove Street, let Spetrino out of the car, and then park the car while Spetrino entered the building. Spetrino's father, after parking the car, also entered the building. Agent Macrino then telephoned the Spetrino residence. The person who answered the phone, probably Spetrino's mother, responded that Spetrino was not at home and that she had not seen him. She also stated that Spetrino's father was not at home, but was expected back soon. Pauses in the conversation led Agent Macrino to believe that the speaker was receiving guidance from someone else who was with her. Agent Macrino waited for a short period and again called the Spetrino residence. During this second call, Agent Macrino spoke with Spetrino's father who said that Spetrino was not at home, and that he had not recently seen him.

Agent Macrino left three agents to guard the outside of the Spetrino residence and, along with Agent Rasor, walked toward the building. As the two approached, Agent Macrino noticed a man on the third-floor front porch scanning the neighborhood. The two agents entered the building, went to the Spetrinos' second floor apartment, and knocked on the door. Spetrino's father answered and again said that his son was not home and that he had not seen him recently. After receiving permission, Agent Macrino and Agent Rasor looked around the apartment but did not find Spetrino.

Agent Macrino left Agent Rasor with Spetrino's father and went to the third floor of the building. He knocked on the door and defendant Donaldson answered. Donaldson was the same man who had been scanning the neighborhood from the third-floor front porch.

Macrino identified himself as a Secret Service agent and showed his commission papers and badge. He told Donaldson that he had a warrant for Spetrino's arrest, and showed Donaldson a picture of Spetrino. Agent Macrino asked if Spetrino was in the apartment. Donaldson said that Spetrino was not. When Agent Macrino asked if he could enter the apartment and look around, Donaldson asked if the agent had a warrant. Agent Macrino said he did and showed him a copy of the arrest warrant for Spetrino. Donaldson said that unless Agent Macrino had a search warrant for the apartment, he would not permit him to enter.

Meanwhile Agent Rasor joined Agent Macrino and also tried to persuade Donaldson to permit them to search the apartment. They explained that if he was hiding Spetrino, he would be committing the crime of harboring a fugitive. Donaldson maintained that Spetrino was not inside and that the agents could not enter without a search warrant.

Agent Rasor then went back downstairs and again spoke with Spetrino's father. The agent explained that he and the other agents had conducted a surveillance of the building and knew that Spetrino was somewhere within. Spetrino's father then ad-

mitted that Spetrino was hiding upstairs in Donaldson's apartment.

Agent Rasor returned to the third floor and told Donaldson that he knew that Spetrino was within the apartment. He instructed Donaldson to step aside to permit the agents to enter and make the arrest. Donaldson continued to refuse the agents · entry and again told them that without a search warrant they could not enter the apartment. Agent Rasor shoved Donaldson aside, and the two agents went into the apartment. As they pushed past Donaldson, a minor shoving match occurred at the door of the apartment.

After the agents had pushed past him, Donaldson moved toward the bedroom. Agent Rasor drew his gun and commanded Donaldson to stop. By this time, Donaldson, with Agent Rasor following, was inside the bedroom. Agent Rasor ordered Donaldson to sit in a chair. Donaldson did so, and Rasor stood facing him. Spetrino was found behind a bed.

Spetrino and Donaldson were placed under arrest and taken to the Westport barracks of the State Police. After being advised of his rights and waiving them, Donaldson told Agent Healy about the events which had led to his arrest. Donaldson said that at about 5:00 p.m., Spetrino had knocked on the door and told Donaldson that he was being watched by someone. Donaldson asked Spetrino if the persons watching him were the same persons who had arrested him on June 29. Spetrino said that he thought so. Spetrino then asked Donaldson if he could stay in the third floor apartment because the Secret Service agents could not enter the third floor apartment without a search warrant. Spetrino offered Donaldson twenty dollars so that Donaldson and his girlfriend and her children could "go to a movie or something." Donaldson agreed. Before Donaldson, his girlfriend, and the children could leave, however, the Secret Service agents arrived at the door. Donaldson said he knew that protecting Spetrino and lying to the agents was wrong. This account was reduced to writing and signed by Donaldson.

## DISCUSSION

Donaldson argues that the search of his apartment was unlawful under *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), that it was error to admit evidence relating to his assertion of his fourth amendment rights, and that the trial judge gave an improper charge to the jury. We address these claims seriatim.

### 1. *Legality of the Search*

■ In *Steagald*, the Supreme Court held that without a search warrant and absent other justifying circumstances, the police may not enter the home of a third party to search for the subject of an arrest warrant. In the instant case, the district court held that the circumstances surrounding the arrests of Spetrino and Donaldson were sufficiently exigent to justify the warrantless search. We agree with the result but differ as to the grounds.

The facts in *Steagald* are quite different from those before us. In that case, Drug Enforcement Administration ("DEA") agents had a six-month-old arrest warrant for one Ricky Lyons, and probable cause to believe that he had taken up residence in a third party's home, but they had no search warrant for that building. Solely on the strength of the arrest warrant for Lyons, the agents entered and searched the house. Although they did not find Lyons, they did find cocaine stashed in a suitcase in a closet. The Court stated:

> [T]he narrow issue before us is whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances.

451 U.S. at 212, 101 S.Ct. at 1648.

The Court noted that in such cases the interests protected by search warrants and arrest warrants differ—while an arrest warrant may protect a suspect from groundless arrest, it is not a license to

enter and search the home of a third party. The Court concluded that

> while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect [Steagald's] privacy interest in being free from an unreasonable invasion and search of his home. Instead, [Steagald's] only protection from an illegal entry and search was the agent's personal determination of probable cause. In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant ...

451 U.S. at 213, 101 S.Ct. at 1648. The Court noted that the circumstances surrounding the search of the house were not exigent, and held that the search was illegal.

We do not reach the question of whether sufficiently exigent circumstances existed to justify the search of Donaldson's apartment. Unlike the situation in *Steagald,* where the law enforcement personnel entered the home on the basis of the arrest warrant alone, the agents in the instant case had probable cause to arrest Donaldson, and the search was a valid incident to that arrest.

Under 18 U.S.C. § 1071, it is a crime to harbor or conceal any person "for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person...." Donaldson had knowledge of the arrest warrant for Spetrino, was harboring and concealing him, and, by lying to the agents about Spetrino's presence, had taken a positive step to prevent the agents from discovering Spetrino. *See United States v. Silva,* 745 F.2d 840, 848 (4th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985).

At the time of the search, the agents knew that Spetrino was in the building but not in his own apartment. They had observed Donaldson scanning the neighborhood from the third-floor porch. They then went to the third-floor apartment, asked Donaldson if Spetrino was inside, and showed him the arrest warrant. He lied about Spetrino's presence, an act clearly intended to help the latter escape, and demanded to see a search warrant. Agent Rasor then returned to Spetrino's apartment where Spetrino's father told him that Spetrino was upstairs. At that point, the agents had ample probable cause to arrest Donaldson. *See United States v. Kutas,* 542 F.2d 527, 528 (9th Cir.1976) (affirming conviction for harboring and concealing escaped prisoner, 18 U.S.C. § 1072, *cert. denied,* 429 U.S. 1073 (1977); *United States v. Biami,* 243 F.Supp. 917, 918 (E.D.Wis. 1965) (refusal to admit officers so as to prevent discovery of subject of arrest warrant was an act of harboring or concealing).

*Steagald* merely holds that an arrest warrant for a fugitive does not, absent other validating circumstances, justify a warrantless search of a third party's home. It thus places fugitives on the same constitutional footing as contraband such as drugs and requires that searches for them meet the usual requirements of the fourth amendment. Nothing we say here is in any way inconsistent with that proposition. Our holding, rather, is that when an investigation on the scene develops probable cause to arrest the third party on those premises for harboring the fugitive, a warrantless search may then be made, just as if an investigation on the scene had developed probable cause to believe that the third party was guilty of running a drug mill. The distinction is that in *Steagald,* the sole basis for the search was the arrest warrant for the fugitive, whereas in the present case, the basis is the illegal conduct and arrest of the third party.

It is indisputable that the agents, after their first talk with Donaldson and after Spetrino's father revealed the son's whereabouts, could have arrested Donaldson for harboring Spetrino and thereafter made a

valid search incident to that arrest. The only distinction between that case and the present one is that Donaldson was not formally arrested until after Spetrino was found. That technicality has not been elevated to a rule of law, however. So long as the "formal arrest follow[s] quickly on the heels of the challenged search [it is] not ... particularly important that the search preceded the arrest rather than vice versa." *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *see also United States v. Vasquez,* 638 F.2d 507, 523–24 (2d Cir.1980), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). To be sure, care must be taken to avoid bootstrapping that allows the fruits of a search incident to an arrest to provide the basis for the arrest. However, no such problem arises in the present case. Donaldson's criminal knowledge and intent were plain, and the agents were well aware of Donaldson's crime, as evidenced by their alerting him to the consequences of harboring Spetrino. Compared with *Vasquez,* where a search incident to a *Terry* stop, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), created enough suspicion to justify a further search after which an arrest occurred, the danger of bootstrapping here is minimal. While it might have been better if the agents had removed any doubt as to the legality of their search by obtaining a search warrant for Donaldson's apartment, under the particular circumstances of this case, we do not find that the search was unlawful.

2. *Other Grounds for Reversal*

■ Donaldson also contends that the trial court committed reversible error by allowing the introduction of evidence of the delay in Spetrino's arrest that resulted from Donaldson's assertion of his perceived constitutional rights. Having been shown the warrant for Spetrino's arrest, and told that his aiding Spetrino would constitute criminal harboring or concealing, Donaldson continued to lie about Spetrino's presence. As discussed above, such lying was criminal conduct, and thereafter Donaldson had no fourth amendment right to assert.

Evidence of the delay was therefore admissible.

■ Donaldson's argument regarding the jury instruction is also meritless. He requested a charge that would have, in essence, put to the jury the issue of Donaldson's assertion of his perceived fourth amendment rights after the district court had properly decided it as a matter of law. The district court's refusal to do this was proper under the circumstances.

Affirmed.