**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 19 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

vs.

BRUCE MILES,

      Defendant - Appellant.

No. 00-3230
(D.C. No. 99-CR-40087-SAC)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McWILLIAMS**, and **JONES**,[**] Circuit Judges.

      Bruce Miles entered a conditional plea of guilty to possession of a firearm after former conviction of a felony, 18 U.S.C. §§ 922(g) and 924(a)(2). On appeal, he contests the district court's denial of his motion to suppress evidence discovered in the third-party residence in which he was arrested.

---

      [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

      [**] Honorable Nathaniel R. Jones, Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

<u>Background</u>

On the morning of November 3, 1998, one Kansas and two Topeka police officers went to the home of Yvonne and Yvette Sugura, hoping to find Bruce Miles and execute a state warrant for his arrest.[1] II R. at 9-10, 13-14, 70. Prior attempts to locate and apprehend Mr. Miles at other addresses had been unsuccessful, <u>id.</u> at 56-57, 68, and an anonymous tip to the "CrimeStoppers" hotline had reported that Mr. Miles was "staying" at the Suguras' home. <u>Id.</u> at 11-12. Yvonne Sugura met the police at the door. <u>Id.</u> at 12. In response to the officers' inquiries, she acknowledged that she had heard Mr. Miles' name before, pointed upstairs to her daughter Yvette's apartment, and invited them in to speak with Yvette [hereinafter "Ms. Sugura"]. <u>Id.</u> at 12-13, 23-24, 66.

While one officer stood guard at an outside door, <u>id.</u> at 77-78, the other two went upstairs to Ms. Sugura's apartment. <u>Id.</u> at 13-14. The testimony is inconsistent as to whether the door was answered by Tony Solis (Ms. Sugura's boyfriend), <u>id.</u> at 13, or Kendra Zabala (Mr. Miles' then-girlfriend[2]). <u>Id.</u> at 59;

---

[1] Yvette Sugura testified that the officers were accompanied by five or six United States Marshals. II R. at 41-42. The officers did not recall whether marshals were present, but conceded that it was possible. <u>Id.</u> at 26-27, 68. <u>But see id.</u> at 76 (noting that presence of additional officers would have been reflected in contemporaneous reports of the encounter). The district court found that only three officers were present. I R., Doc. 32 at 6.

[2] Officer Mechler testified that Ms. Sugura referred to Mr. Miles as "her <u>roommate's</u> boyfriend". II R. at 70 (emphasis added). There is no other

(continued...)

see also V R. at 24.  In any case, the police eventually spoke with Ms. Zabala, who told the officers that Ms. Sugura was asleep.  II R. at 14-15.  The officers' indicated that they needed to speak with Ms. Sugura and asked Ms. Zabala to wake her up.  Id.

Ms. Sugura came to the door, wrapped in a blanket, id. at 70, and told the officers "that she hadn't seen [Mr. Miles], [that] he hadn't been around."  Id. at 15.  When the officers asked to come in and look for him, Ms. Sugura replied "I'd rather you didn't."  Id.  As the officers attempted to persuade her, she stepped out into the hall.  Id. at 15, 32.  It was evident to the officers that she was very nervous.  Id. at 15-16, 59-60, 70-71, 75-76; see also id. at 49.  At one point, an officer informed her that if she was lying about Mr. Miles' presence in the apartment, she could be arrested for harboring a fugitive or aiding a felon.  Id. at 31, 71.  After "approximately seven minutes," Aplt. Br. at 20,[3] Ms. Sugura admitted that Mr. Miles was in the apartment and consented to the officers' search.  II R. at 34, 61.  Immediately upon the officers' entry, Mr. Miles stepped forward.  Id. at 17.  One officer saw a gun in plain view and asked to whom it

[2](...continued)
indication that Ms. Zabala resided in the apartment.

[3] But cf. II R. at 60 (Off. Mechler: two minutes elapsed between initial knock and Ms. Sugura's consent); id. at 78-79 (Off. Cochran: encounter lasted five to ten minutes).

belonged; Mr. Miles admitted that the gun was his.[4]  Id. at 17-18.

A grand jury returned a two-count indictment against Mr. Miles.  I R., Doc. 1.  When his motion to suppress the gun and certain incriminating statements was denied, I R., Doc. 32, Mr. Miles entered a conditional plea of guilty to Count I of the indictment – possessing a firearm after conviction of a felony.[5]  I R., Doc. 36.  This appeal followed.

## Discussion

The question before us is whether the officers' entry into Yvette Sugura's apartment, upon which they discovered evidence tending to incriminate Mr. Miles, was reasonable under the Fourth Amendment despite the absence of a search warrant.  The government argues that the search was justified by the officers' objectively reasonable belief that Mr. Miles was both living in and present in the apartment at the time of the search.  Aplee Br. at 6-12; see also Payton v. New York, 445 U.S. 573, 603 (1980) ("[A]n arrest warrant founded on probable case implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.");

_____

[4] Mr. Miles has waived his Miranda claim on appeal.  See Coleman v. B-G Maint. Mgmt. of Colo., Inc., 108 F.3d 1199, 1205 (10th Cir. 1997).

[5] In exchange, the government agreed to dismiss Count II.  III R., Att. at 2, ¶ 3(a); IV R. at 4.

Valdez v. McPheters, 172 F.3d 1220, 1224-25 (10th Cir. 1999) (holding that Payton does not require that the arrestee actually reside in the residence searched, provided that the officers had a "reasonable basis for believing that [the arrestee] both (1) lived in the residence and (2) could be found within at the time of entry"). In the alternative, the government argues that Yvette Sugura consented to the search of her apartment, Aplee. Br. at 15-23, and that the search was supported by exigent circumstances. Id. at 12-15; see also Steagald v. United States, 451 U.S. 204, 216 (1981) (holding that arrest warrant does not authorize search of third-party dwelling in which arrestee does not reside in the absence of consent or exigent circumstances). Because we hold that Ms. Sugura's consent was valid, we need not address the government's other two arguments (i.e., Payton/Valdez and exigent circumstances).

Whether a party has voluntarily consented to a search is a question of fact that the district court must evaluate in light of the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In order to establish voluntariness, the government must "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and "prove that this consent was given without implied or express duress or coercion." United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996) (internal quotations and citation omitted). As with all questions of fact, when "[r]eviewing the denial

of a motion to suppress, we accept the district court's factual findings unless clearly erroneous." United States v. Davis, 197 F.3d 1048, 1050 (10th Cir. 1999) (citation omitted).

Upon a thorough examination of the record, we see no grounds to reject the district court's finding that Yvette Sugura voluntarily consented to the officers' limited search of her apartment. Doc. 32 at 17. Mr. Miles lists several factors that, in his opinion, "establish, at best, coerced acquiescence, not voluntary consent." Aplt. Br. at 19. He notes that the police threatened to arrest Ms. Sugura for harboring a fugitive, that more than one officer was present and that they "were in uniform with visible weapons," that she was not advised – in a consent form or otherwise – that she could refuse consent, that the encounter took place at her door when she had just awakened and was "wrapped in a blanket," that the encounter lasted approximately seven minutes, and that she believed she had no choice but to consent. Id. at 19-20.[6] Although we emphasize that our ruling is based on a consideration of the totality of the circumstances, we will

---

[6] Mr. Miles also lists "fear and intimidation" as a relevant factor, but it is unclear whether he is referring to the officers' methods or Yvette Sugura's state of mind. Aplt. Br. at 20. Neither is supported by the record. The only testimony as to the officers' allegedly intimidating manner "is Ms. Sugura's testimony, when led by defense counsel, that Officer Mechler looked at her '[k]ind of sternly?' and '[k]ind of intimidating?'" Aplee. Br. at 18-19 (quoting II R. at 49). In Ms. Sugura's own words, Officer Mechler "just looked at me like 'Are you lying,' kind of . . . I think she was looking at me to kind of tell whether I was lying or not . . . ." II R. at 48-49.

briefly discuss each of the above factors.

First, the officers' alleged "threats" do not rise to the level of coercion or duress necessary to negate consent. During their brief encounter with Ms. Sugura, one officer truthfully informed her that she <u>could</u> be arrested for harboring a fugitive or aiding a felon if she was lying about Mr. Miles' presence in the apartment. II R. at 31, 71. Even generously construed as a "threat," this statement was not the type of threat that negates an otherwise voluntary consent. <u>See, e.g.</u>, <u>United States v. Morrow</u>, 731 F.2d 233, 236 (4th Cir. 1984) ("Although [the officer] did tell [the defendant] . . . that she could be charged as an accessory . . . that statement alone hardly amounts to duress or coercion . . . ."); <u>see also</u> <u>United States v. Donaldson</u>, 793 F.2d 498, 502 (2d Cir. 1986) (holding, on similar facts, that "when an investigation on the scene develops probable cause to arrest the third party [resident of] those premises for harboring the fugitive, a warrantless search [incident to the arrest] may then be made . . . ."). In this case, the officer's statement did not relate to Ms. Sugura's refusal to consent to the search, but only to her statements that Mr. Miles was not in the apartment. The officers never threatened to punish Ms. Sugura for refusing to consent, they merely advised her that harboring a fugitive was itself a crime, for which she could be arrested. Accordingly, the cases in which courts have found an officer's threats to negate consent are inapposite. <u>See, e.g.</u>, <u>United States v. Bolin</u>, 514

F.2d 554, 559-60 (7th Cir. 1975) (holding consent not voluntary where police threatened to arrest defendant's girlfriend if he refused to sign consent form); Waldron v. United States, 219 F.2d 37, 39 (D.C. Cir. 1955) (consent not voluntary where "police 'said if they had to get a search warrant, that it wouldn't be their responsibility of [sic] what happened to what was in the apartment, and if I were to let them in on my own free will, that they would put everything back where they got it'").

The other factors cited in Mr. Miles' brief are equally unpersuasive. We see no clear error in the district court's finding that only three officers were involved in the encounter at issue. I R., Doc, 32 at 6; cf. supra note 1. There is nothing unusual or inherently coercive about the presence of three uniformed and armed officers. Although it is true that pressure on a detainee to consent to a search may be increased by the presence of more than one officer and by an officer's failure to advise the individual of his right to refuse the officer's request, United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996), Yvette Sugura was not a detainee – she was in her own home. Even in the detention context, moreover, neither factor is dispositive. Id.; accord United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994). Nor it is necessary that officers obtain a signed consent form in order to insulate an otherwise knowing and voluntary oral consent against attack. See Schneckloth, 412 U.S. at 231.

The record indicates that Ms. Sugura chose to come to the door wrapped in a blanket. II R. at 70. Although a person's "vulnerable subjective state" is one factor to consider in determining whether consent was voluntary, Schneckloth, 412 U.S. at 229, we are persuaded that Ms. Sugura's consent was voluntary despite her chosen attire – or lack thereof. Cf. United States v. Dickerson, 975 F.2d 1245, 1249 (7th Cir. 1992) (holding that naked man "voluntarily consented" to warrantless entry by four police officers who appeared, weapons drawn, at his front door, and physically prevented him from shutting it). The brief duration of the encounter is also unobjectionable. II R. at 60 (two minutes); Aplt. Br. at 20 ("approximately seven minutes"); II R. at 78-79 (five to ten minutes). Finally, Ms. Sugura's own testimony contradicts Mr. Miles' assertion that she believed she had no choice but to consent. E.g., II R. at 45 (Ms. Sugura: nothing she "did in discussing anything with the officers" was "done involuntarily"); id. at 53 (Ms. Sugura: "I didn't really care if [the officers] came in. I just wanted them to get [Mr. Miles] and leave my house."). The district court did not clearly err in crediting Ms. Sugura's testimony as to her own state of mind. See United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996) ("Evaluation of the credibility of the witnesses, the weight to be given the evidence, and inference to be drawn from the evidence are for the district court.").

Accordingly, the district court's denial of Mr. Miles' motion to suppress

was not error and the judgment is AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge