## Richmond

### HENRY F. TAYLOR

### V.

### COMMONWEALTH OF VIRGINIA

December 4, 1981.

Record No. 801978.

Present: All the Justices.

*Charles F. Purcell (Purcell and Purcell,* on brief), for appellant.
*Alexander E. Conlyn, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

A jury found defendant Henry F. Taylor guilty of grand larceny and fixed his punishment at six months in jail plus a fine of $500. He appeals the trial court's September 1980 judgment of conviction confirming the jury's finding and sentencing defendant in conformity with the verdict.

The sole issue on appeal is whether the court below properly denied defendant's motion to suppress evidence discovered as the result of a warrantless search of a truck standing on a public highway. More precisely, the dispositive inquiry is whether there was probable cause to believe the vehicle contained the fruits of a crime.

Just before midnight on January 30, 1980, State Trooper P. T. Spencer, Jr., was patrolling in his police cruiser on Route 33 in the Town of Louisa. Town Officer Kenny James Harper was riding with Spencer. Snow was falling and the weather conditions were "nasty." As Spencer drove east near the intersection of Routes 33 and 22, he observed a two-and-one-half-ton truck, with an enclosed body containing no exterior lettering, parked headed west on Route 22. The truck entirely blocked the westbound lane with its left wheels within one foot of the double solid lines marking the center of the highway. Spencer turned, drove through a shopping center parking lot, "came in behind" the large white and silver truck, and stopped to its rear. The truck's "motor was running and the lights were on," but no "emergency flashers" were in use.

As the trooper alighted from his vehicle, he observed that no person was on the "driver's side" of the truck cab. Approaching that side, Spencer found LeRoy Washington sitting on the "passenger's side" of the vehicle. When asked by the officer "what the problem was," Washington replied that the driver was talking to friends near a Ford Mustang automobile parked in the shopping center lot. Spencer looked across the road, observed the Mustang

about 100-200 feet away, and saw defendant Taylor walk from the car through the lot towards him.

Taylor proceeded across the road to where Spencer was standing beside the truck. Upon being asked by the officer "what the problem was," defendant said he had stopped to converse with "friends" and that he was preparing to "move on." The trooper asked Taylor for his operator's license; he replied that he had none "with him." Spencer asked defendant "if he had any identification;" the accused said he did not. The officer asked Taylor who owned the truck; defendant replied his sister-in-law had rented the truck. Upon Spencer's request for "the rental papers," defendant handed him a carbon copy of an Avis-Rent-A-Car "bill." The only handwriting legible in any of the numerous blank spaces on the pre-printed form was the signature "Gaynelle Baird." Spencer testified that Taylor "had nothing with him to indicate who he was or that he was supposed to have possession of the vehicle."

The trooper then inquired of defendant "where he was coming from"; Taylor replied he did not know. He also said he "didn't know where he was going." The officer asked how defendant acquired possession of the truck; Taylor responded that "he just picked it up on [the] side [of] the road and did not know exactly where."

The officer then observed that the 1978-model truck appeared to be in good mechanical condition. But when he looked at the left rear wheels, the truck's springs on the left side were depressed to the point that the truck body was almost touching the left rear tires. At that location the highway from side to side was level. The officer then asked defendant "what was in the truck;" the accused responded "it was empty." When Spencer called the truck's tilt to defendant's attention, Taylor said "it was always like that." From his police experience in weighing vehicles, the trooper knew that the truck had "an exceptional amount of weight" on the left side. Spencer also noticed that the truck had a hydraulic lift on the rear which, he said, "is ideal for stealing something."

The officer then placed defendant under arrest for the traffic infraction of stopping a motor vehicle on a public highway in such a manner as to impede or render dangerous the use of the highway by others. Code §§ 46.1-248 and -16.01. The trooper put defendant in the custody of Town Officer Harper who had remained at the police vehicle.

Spencer returned to the truck cab and talked to Washington, who also had no operator's license and no identification, also did not know where he and defendant had come from, also was unaware where they had "picked up" the truck, and also claimed the truck was empty. Washington was then taken back to the police car so the town officer could "watch" him. Because he was confronted with "two extremely nervous individuals," Spencer asked Harper to call by radio for additional officers "to take care of" the individuals, five in number, who were at the Mustang in the parking lot.

Realizing the police on the scene were outnumbered seven to two and that the five persons at the Mustang were friends of both defendant and Washington, the trooper, describing the circumstances as "a very volatile situation," decided to examine without a warrant the inside of the truck's rear compartment. Spencer said that, based on his experience of 11 years as a police officer, he was "sure" the vehicle contained stolen property. He also testified that he felt it was important to conduct the search at that time before the individuals in the Mustang could drive away. After defendant refused to comply with Spencer's request to open the rear of the truck, the trooper raised the unlocked rear door.

Upon looking into the compartment, Spencer saw a yellow flashlight and a red "ton and a half come-along," described as a type of block and tackle used to move heavy equipment. He also observed at the left front corner of the storage area a large wooden spool wrapped with new, heavy aluminum wire, which, upon investigation, was found to belong to the Virginia Electric and Power Company. The wire, having a steel core, was about 6000 feet long, weighed about 3000 pounds and was valued in excess of $2100. The spool was standing on its rims and was being braced by a wooden site sign from a VEPCO storage facility located near Mineral in Louisa County.

Shortly after Spencer had completed his examination of the rear of the truck, a number of additional officers arrived. The seven individuals at the scene were arrested and charged with larceny of the wire.

Subsequent investigation and the evidence revealed that earlier during the day in question defendant and one of the accomplices sent Gaynelle Baird, defendant's sister-in-law, to Charlottesville with $100 cash to rent a truck for them. They told her the truck was to be used to haul furniture. After completing the transaction

at the Avis Company, Baird handed the keys to the truck and the rental receipt to defendant. By prearrangement, the group of seven men arrived at the storage facility, an open field, in the Mustang and the truck between 8:00 p.m. and 10:00 p.m. to steal the wire. After laboring about one and one-half hours at the site, the crew was finally able manually to hoist one spool of wire from the ground into the truck; they tried to employ the hydraulic lift but the weight of the wire prevented its use. The two vehicles were driven from the scene of the crime directly to Louisia where the arrests took place.

Following a pretrial hearing, the trial court overruled defendant's motion to suppress all evidence obtained during the search of the truck and all other evidence derived from the alleged illegal search. On appeal, defendant argues the lower court erred because the warrantless search of the rented vehicle was illegal as not justified by any exception to the Fourth Amendment warrant requirement. We do not agree; we hold the officer acted upon probable cause in exigent circumstances.

■ One of the established exceptions to the warrant requirement is that if a search without a warrant is made of an automobile or other vehicle on the highway upon probable cause and if it is not practicable to secure a warrant because the motor vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought, the search is valid. *Carroll* v. *United States,* 267 U.S. 132, 149, 153 (1925). In this case, defendant understandably does not dispute the fact that exigent circmstances were present at the time. Instead, he contends the officer lacked probable cause to search the truck.

■ The legal standard of probable cause, as the term suggests, relates to probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons. The presence or absence of probable cause is not to be examined from the perspective of a legal technician. Rather, probable cause exists when the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, alone are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. *Draper* v. *United States,* 358 U.S. 307, 313 (1959); *Schaum* v. *Commonwealth,* 215 Va. 498, 500, 211 S.E.2d 73, 75 (1975). In order to ascertain whether probable cause exists, courts will focus upon "what the totality of the circumstances meant to police of-

ficers trained in analyzing the observed conduct for purposes of crime control." *Hollis* v. *Commonwealth,* 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976).

■ In articulating his contention that probable cause was lacking, defendant says that, admittedly, the officer could "guess" the truck was loaded based on the depressed springs. However, defendant argues, there was "nothing connecting the fact that it was loaded to the fact that it was loaded with contraband as opposed to furniture or other legal material." Defendant notes that neither Trooper Spencer nor Officer Harper had been made aware of any alleged unlawful activity by defendant or his accomplices, other than the improper stopping of the vehicle. He points out that the police were not on the lookout for these individuals or this particular truck. Defendant contends the "sole basis" for the search was the belief the truck was loaded with "something" and defendant's denial that it was, in fact, loaded. He argues that Trooper Spencer's "suspicion" that the truck contained stolen goods was "clearly no more than a hunch on his part" and factually is insufficient to establish probable cause. We disagree with defendant's analysis of the evidence.

At this appellate stage of the proceedings we examine the evidence in the light most favorable to the Commonwealth. From that perspective, we turn to the facts and consider what the totality of these circumstances meant to a police officer trained to interpret human conduct for the purpose of law enforcement.

Trooper Spencer was confronted at night in "nasty" weather with an unmarked truck blocking an entire travel lane of a public highway. The truck had its motor running and its lights were burning. It was in apparent good mechanical condition, equipped with a hydraulic lift that was "ideal for stealing something." Both occupants were "extremely" nervous. They professed to have no operator's licenses and no identification. They said they did not know where they had been or where they had obtained possession of the vehicle. The document offered to corroborate the fact the vehicle was leased to defendant's relative furnished no information about the rental; that fact was apparent from a mere glance at the paper. The occupants maintained that the vehicle was empty; yet it obviously was loaded. Near the truck and its occupants was a group of five "friends," congregated around another motor vehicle, who remained aloof during questioning of defendant and Wash-

ington. As the trooper viewed the situation, it was "very volatile" and "the vehicle was under extreme suspicious circumstances."

We conclude that those facts, taken as a whole in that setting as viewed by a trained police officer were sufficient to believe the truck probably contained stolen property. *See Adkins* v. *Commonwealth*, 218 Va. 945, 948, 243 S.E.2d 205, 207 (1978).

The case of *Matthews* v. *Commonwealth*, 218 Va. 1, 235 S.E.2d 306 (1977), relied on by defendant, is inapposite. There, a state trooper stopped the defendant for a traffic violation. While talking to the motorist, the officer observed a pack of cigarette wrapping paper on the floorboard of defendant's car. After examining the paper, the trooper looked further and discovered a folded brown paper bag tucked beside the driver's seat. Upon picking up and opening the bag, the officer discovered a quantity of marijuana.

We reversed defendant's conviction for possessing the substance, holding the search and seizure of the bag was illegal. We held the trooper lacked probable cause to believe defendant possessed marijuana. We noted that the police officer made "some connection" between the cigarette papers, sometimes used for illegal purposes, and the brown bag. We said, however, that "the connection was not combined with any other circumstances which might have justified a rational belief that the bag contained contraband drugs." 218 Va. at 3, 235 S.E.2d at 307.

But in the present case, contrary to defendant's argument, the obvious fact, denied by the occupants, that the vehicle was loaded was combined with the many other circumstances that we have enumerated to justify a rational belief that the truck contained fruits of a crime.

For these reasons the judgment appealed from will be

*Affirmed.*