Present:  All the Justices

LEON PARKER

OPINION BY JUSTICE LEROY R. HASSELL, SR.

v.    Record No. 971010                    January 9, 1998

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

I.

The primary issues in this appeal are whether an encounter between a police officer and a pedestrian constituted a seizure within the meaning of the Fourth Amendment of the Constitution of the United States and, if so, whether the seizure was constitutionally permissible.

II.

Leon Darnell Parker was indicted in the Circuit Court of the City of Richmond for possession of cocaine with intent to distribute in violation of Code § 18.2-248.  The defendant filed a pretrial motion to suppress evidence of crack cocaine that had been seized from his person on the basis that this evidence was obtained in violation of the Fourth Amendment.  The trial court denied the motion and, at a bench trial, convicted the defendant of the charged offense.  The Court of Appeals affirmed the judgment of the circuit court in an unpublished opinion, and we awarded the defendant an appeal.

We will summarize the facts adduced at the suppression hearing and, under familiar principles, we will consider the testimony in the light most favorable to the Commonwealth, the prevailing party below.  On July 13, 1995, City of Richmond police officer Michael J. Kurisky, who was wearing a police

uniform and displaying a badge of authority, drove a white police cruiser to a public housing development known as Creighton Court. Officers John O'Connor and Wes Moore were passengers in Officer Kurisky's police cruiser. The police officers were "checking various areas . . . for drug activity."

As Officer Kurisky drove his police cruiser onto Creighton Road, a street in the housing development, the officers observed a group of men "standing around a white Cadillac which had its trunk open." Officer Kurisky had made numerous prior drug arrests in the area, and he had recovered drugs and weapons in the immediate area where the men were located. Officer Kurisky "personally consider[ed] that area to be an open-air drug market."

When Officer Kurisky drove his police cruiser near the Cadillac, the men looked toward him, immediately shut the car's trunk, and began to disperse. Officers O'Connor and Moore got out of the police cruiser, and Officer Kurisky remained in the vehicle.

As Officer Kurisky watched the men disperse, he saw the defendant "turn and place an item with his right hand in the waistband of his shorts." The defendant proceeded to walk on Creighton Road, away from the Cadillac. While the two other officers remained at the scene, Officer Kurisky "backed the police vehicle up" and drove down Creighton Road following the defendant. Officer Kurisky drove the police cruiser "parallel" to the defendant who was about 20 feet away from him. Officer Kurisky was looking at the defendant, who then "looked at the

direction of the police vehicle, turned around and started walking back on the sidewalk the other way." Officer Kurisky, still in his police cruiser, continued to follow the defendant, who began to walk on "posted" property owned by the Richmond Redevelopment and Housing Authority. Officer Kurisky, continuing to follow the defendant, drove the police cruiser 40 feet off the street onto the Richmond Redevelopment and Housing Authority's property and stopped the car at the location where the defendant was standing.

Officer Kurisky, who possessed clearly visible weapons, approached the defendant and inquired whether he lived in the public housing development. In response to the officer's inquiry, the defendant stopped and responded that he did not live there. Officer Kurisky asked the defendant if he had any guns or drugs in his possession, and the defendant replied, "no." Officer Kurisky then asked the defendant if the officer could "pat him down," and the defendant put his hands up in the air. Officer Kurisky "went around behind [the defendant] and just patted him down for any weapons or drugs" and found none.

After Officer Kurisky conducted this search, another Richmond police officer, Mark Ambrozy, approached the defendant who was wearing a white basketball jersey, white "mesh" basketball shorts, and a pair of thin white or peach boxer underwear. Officer Ambrozy asked the defendant if he "had anything in his crotch." The defendant replied that he did not, and "he grabbed his basketball shorts and boxer shorts and started, in very exaggerated motions, pulling them to the side,

up and down, shaking them in and out . . . ."

As the defendant made these exaggerated motions, Officer Kurisky saw "a pink object through the boxer shorts material." Officer Kurisky placed his hand on the object and realized that the object was crack cocaine.  When Officer Kurisky removed the item from the defendant's waistband, he found a sandwich bag containing 18 red ziploc baggies, and each baggie contained a substance later identified as crack cocaine.  Officer Kurisky did not ask the defendant for permission to conduct this search.

### III.

### A.

The defendant argues that Officer Kurisky violated the defendant's Fourth Amendment rights because he was seized when the officer drove the police cruiser 40 feet away from the street onto a common area at the housing development in order to question the defendant.  The Commonwealth responds that this encounter did not constitute a seizure within the meaning of the Fourth Amendment.  We disagree with the Commonwealth.

The Fourth Amendment of the Constitution of the United States provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated . . . ."  This guarantee applies to seizures of the person as well as to seizures of the houses, papers, and effects of an individual. Baldwin v. Commonwealth, 243 Va. 191, 195, 413 S.E.2d 645, 647 (1992). The United States Supreme Court stated the following test which we must apply when determining whether a person has been

seized within the meaning of the Fourth Amendment:

> "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' United States v. Martinez-Fuerte, 428 U.S. 543, 554 [(1976)]. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
>
> Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503, 515 [(1963)].' Schneckloth v. Bustamonte, 412 U.S., at 225 [(1973)].
>
> We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (opinion of Stewart, J.) (footnote omitted).

The United States Supreme Court applied the Mendenhall test in Michigan v. Chesternut, 486 U.S. 567, 573 (1988), and made the following observation which is equally pertinent here:

"The test provides that the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'
. . . .
The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."

Accord California v. Hodari D., 499 U.S. 621, 627-28 (1991); INS v. Delgado, 466 U.S. 210, 215 (1984).

Applying these principles, we hold that Officer Kurisky's encounter with the defendant constituted a seizure within the meaning of the Fourth Amendment. As we have already stated, Officer Kurisky was wearing a police uniform, displaying his badge of authority, and possessed clearly visible weapons on his utility belt. The officer, driving his police cruiser, followed the defendant, who sought to avoid the officer by walking in different directions. The officer followed the defendant from the moment he left the Cadillac until he walked on the property owned by the Richmond Redevelopment and Housing Authority. Then, the police officer drove the police cruiser from the street onto the Richmond Redevelopment and Housing Authority's property for a distance of about 40 feet and stopped the cruiser at a location where the defendant was standing. Certainly, under these circumstances, "a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554.

The Commonwealth, however, relying upon Baldwin v.

<u>Commonwealth</u>, <u>supra</u>, argues that the defendant was not seized within the meaning of the Fourth Amendment.  The Commonwealth's reliance upon <u>Baldwin</u> is misplaced.  As we have already stated, any assessment whether police conduct constitutes a seizure implicating the Fourth Amendment must be determined by examining the evidence of record in each individual case, <u>accord</u> <u>Chesternut</u>, 486 U.S. at 573; <u>INS</u> v. <u>Delgado</u>, 466 U.S. at 215.

<u>Baldwin</u> is readily distinguishable and is limited to its unique facts.  There, a police officer drove a police vehicle to a parking lot and saw a man, later identified as Michael T. Baldwin, and a woman companion standing near a dumpster at the rear of the parking lot.  The officer parked his car about 15 feet from the couple, got out of his car, and walked toward them.  The officer acknowledged that he may have "call[ed] for them" as the couple walked away toward some apartments.  When the couple returned to the dumpster area, the officer noticed that Baldwin was having trouble with his balance and could smell an odor of alcohol "about his person."  The officer asked Baldwin whether he had been drinking, and Baldwin stated that "he'd had ten beers which is too much."  Baldwin was "staggering" and his face was "flushed."  The officer arrested him for being drunk in public and subsequently discovered that Baldwin had in his possession marijuana and psilocin (hallucinogenic mushrooms).

Baldwin and his companion gave a different explanation of the events that occurred when the officer approached them.  Among other things, Baldwin and his companion testified that they had been standing together near the trash dumpster, and when they

proceeded to walk toward an apartment, they heard a police car enter the parking lot, and the officer "put a big floodlight on [them] . . . and told [them] to come here, said you two, come over here."

We held in Baldwin that the defendant was not seized because our consideration of all the evidence, including the police conduct at issue, indicated that a reasonable person would have believed that he was free to leave.  Here, however, unlike Baldwin, Officer Kurisky drove his police cruiser forty feet off of the street and onto private property and stopped his police cruiser at the location where the defendant was standing. Without question, Officer Kurisky's acts constituted a show of authority which restrained the defendant's liberty.  Thus, we must next consider whether this seizure was a limited intrusion permitted by the Fourth Amendment as recognized in Terry v. Ohio, 392 U.S. 1 (1968).

B.

The defendant argues that at the time of the seizure, Officer Kurisky had no basis to suspect that the defendant had committed a crime sufficient to give rise to a permissible detention.  The Commonwealth argues that the evidence of record establishes that the officer had a reasonable suspicion to detain the defendant for investigative purposes.  We agree with the Commonwealth.

The United States Supreme Court held in Terry v. Ohio, 392 U.S. at 22, that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for

purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." In order to justify a Terry seizure, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. The United States Supreme Court, explaining the nature of a Terry stop, stated that

> "[i]n addressing the reach of a Terry stop . . . we observed that '[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' . . . [I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." Hayes v. Florida, 470 U.S. 811, 816 (1985); accord Brown v. Texas, 443 U.S. 47, 51 (1979); Simmons v. Commonwealth, 217 Va. 552, 554-55, 231 S.E.2d 218, 220-21 (1977).

In determining whether a police officer had a particularized and objective basis for suspecting that a person stopped may be involved in criminal activity, a court must consider the totality of circumstances. United States v. Cortez, 449 U.S. 411, 417-18 (1981); see Ewell v. Commonwealth, 254 Va. 214, 217, 491 S.E.2d 721, 722-23 (1997); Zimmerman v. Commonwealth, 234 Va. 609, 612, 363 S.E.2d 708, 709 (1988); Leeth v. Commonwealth, 223 Va. 335, 340, 288 S.E.2d 475, 478 (1982). This test is less stringent than probable cause. Id.

We hold that under the facts and circumstances of this case, Officer Kurisky did have a reasonable suspicion, based on objective facts, that the defendant was engaged in criminal

activity. As we have already observed, the defendant was with a group of men in an area described as "an open-air drug market." Officer Kurisky had made numerous drug arrests in the area and had recovered drugs and weapons from that area. When Officer Kurisky drove his police cruiser on Creighton Road, the men, who were standing around the white Cadillac with the trunk open, immediately closed the trunk and dispersed. Officer Kurisky saw the defendant place an object in the waistband of his shorts. Considering the totality of circumstances, and viewing the facts in the light most favorable to the Commonwealth, we are of opinion that Officer Kurisky had a particularized and objective basis for suspecting that the defendant was involved in criminal activity.

## C.

The defendant argues that Officer Kurisky violated the defendant's Fourth Amendment rights when the officer seized the cocaine from the defendant's boxer underwear without a warrant. The defendant says he did not give the officer consent to search his person, and the officer lacked probable cause to seize the objects from the defendant's undergarments.

We agree with the defendant that the record establishes that he did not give the officer consent to remove the crack cocaine from the defendant's undergarments. Officer Kurisky testified that he did not request the defendant's consent before he removed the drugs from the defendant's undergarments. Contrary to the Commonwealth's assertions, the record is simply devoid of any evidence from which an inference can be drawn that the defendant

gave the officer consent to conduct the second search of the defendant's undergarments.

The Commonwealth, however, contends that even if the defendant did not give consent to search his person, Officer Kurisky, nevertheless, was entitled to search the defendant because the officer had probable cause to believe that the defendant possessed illegal drugs.  Responding, the defendant argues that the police officer lacked probable cause to believe that the defendant had either committed a criminal offense or was in the process of committing a criminal offense.  We disagree with the defendant.

The United States Supreme Court has stated that "[w]here the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."  Rawlings v. Kentucky, 448 U.S. 98, 111 (1980).  However, the police must have probable cause to believe that the suspect has either committed a criminal offense or was in the process of committing a criminal offense before searching the suspect.  See United States v. Banshee, 91 F.3d 99, 102 (11th Cir. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 752 (1997); United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997); United States v. Armstrong, 16 F.3d 289, 294 (8th Cir. 1994); United States v. Miller, 925 F.2d 695, 698 (4th Cir.), cert. denied, 502 U.S. 833 (1991); United States v. Potter, 895 F.2d 1231, 1234 (9th Cir.), cert. denied, 497 U.S. 1008 (1990); United States v. Tavolacci, 895 F.2d 1423, 1428 (D.C. Cir. 1990); United States v. Hernandez,

825 F.2d 846, 852 (5th Cir. 1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1068 (1988); <u>United States</u> v. <u>Donaldson</u>, 793 F.2d 498, 502-03 (2nd Cir. 1986), <u>cert.</u> <u>denied</u>, 479 U.S. 1056 (1987); <u>United States</u> v. <u>Gay</u>, 774 F.2d 368, 378 (10th Cir. 1985).

We discussed the concept of probable cause in <u>Taylor</u> v. <u>Commonwealth</u>, 222 Va. 816, 820-21, 284 S.E.2d 833, 836 (1981):

"The legal standard of probable cause, as the term suggests, relates to probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons. The presence or absence of probable cause is not to be examined from the perspective of a legal technician. Rather, probable cause exists when the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, alone are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. <u>Draper</u> v. <u>United States</u>, 358 U.S. 307, 313 (1959); <u>Schaum</u> v. <u>Commonwealth</u>, 215 Va. 498, 500, 211 S.E.2d 73, 75 (1975). In order to ascertain whether probable cause exists, courts will focus upon 'what the totality of the circumstances meant to police officers trained in analyzing the observed conduct for purposes of crime control.' <u>Hollis</u> v. <u>Commonwealth</u>, 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976)."

We hold that the totality of circumstances shown in this record supports the conclusion that Officer Kurisky did indeed have probable cause to believe that the defendant had committed a crime and, therefore, the challenged search was permissible. Officer Kurisky observed the defendant with a group of men in an area described as an "open-air drug market." The officer saw the defendant place something in his basketball shorts. The defendant's shorts were made of a "mesh," "thin" material, and the officer was able to see a pink object between the defendant's undergarments and the defendant's skin.

In addition, Officer Kurisky knew, from personal experience,

that "people often try to hide contraband in their shorts, in their crotch area or in their buttocks area." Officer Kurisky also knew, before he retrieved the items from the defendant's undergarments, that "[p]ink baggies are often one of the colors of baggies used to package . . . crack cocaine." When Officer Ambrozy asked the defendant if he had anything in his crotch, the defendant grabbed the waistbands of both his basketball shorts and his boxer shorts, and pulled "them to the side, up and down" in an apparent effort to prevent the crack cocaine from falling to the ground.

## IV.

For the foregoing reasons, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.

CHIEF JUSTICE CARRICO, JUSTICE COMPTON, JUSTICE LACY, and JUSTICE KOONTZ concur in the result.