Tuesday       5th
December, 2006.

Carmas (Carmus) Jonah McLaughlin,                       Appellant,

 against           Record No. 0250-05-3
                   Circuit Court No. CR04-1194

Commonwealth of Virginia,                           Appellee.

Upon a Rehearing En Banc

Before Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys, Clements,
Kelsey, McClanahan, Haley, Petty and Beales

Jesse W. Meadows, III, for appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.

By opinion dated May 23, 2006, a divided panel of this Court reversed the judgment of the trial court. See McLaughlin v. Commonwealth, 48 Va. App. 243, 629 S.E.2d 724 (2006). Granting the Commonwealth's petition for rehearing *en banc*, we stayed the mandate of the panel decision. Upon rehearing *en banc*, the stay of this Court's May 23, 2006 mandate is lifted, the judgment of the trial court is reversed, and the indictment is dismissed.

Judges Benton, Elder, Frank, Humphreys, Clements, Petty and Beales voted to reverse the judgment of the trial court in accordance with the majority opinion of the panel.

Chief Judge Felton, Judges Kelsey, McClanahan and Haley voted to affirm the judgment for the reasons set forth in the dissenting opinion.

The trial court shall allow court-appointed counsel for the appellant an additional fee of $200 for services rendered the appellant on the rehearing portion of this appeal, in addition to counsel's costs and necessary direct out-of-pocket expenses.

This order shall be published and certified to the trial court.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **11th** *day of* **July, 2006**.

Carmas (Carmus) Jonah McLaughlin, Appellant,

against      Record No. 0250-05-3
                 Circuit Court No. CR04-1194

Commonwealth of Virginia, Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys,
Clements, Kelsey, McClanahan, Haley, Petty and Beales

On June 5, 2006 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on May 23, 2006, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on May 23, 2006 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established: Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc* within 14 days of the date on which the appellee's brief is filed. The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter. It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Kelsey
Argued at Salem, Virginia


CARMAS (CARMUS) JONAH McLAUGHLIN

                                                              OPINION BY
v.        Record No. 0250-05-3                    JUDGE JAMES W. BENTON, JR.
                                                                 MAY 23, 2006
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                        Joseph W. Milam, Jr., Judge

        Jesse W. Meadows, III, for appellant.

        Kathleen B. Martin, Assistant Attorney General (Judith Williams
        Jagdmann, Attorney General, on brief), for appellee.


        Carmas Jonah McLaughlin appeals his conviction for possession of marijuana with intent

to distribute.  He contends the police did not have probable cause to search the vehicle he

occupied and that the evidence was insufficient to support his conviction.  We agree that the

police did not have probable cause to search the vehicle.  Therefore, we reverse the conviction.

                                                I.

        Officer Goins stopped a car because he noticed an equipment violation.  As Officer Goins

exited his vehicle, McLaughlin, the driver and sole occupant, leaned toward the passenger seat.

When McLaughlin told Officer Goins he had a firearm, Officer Goins observed a semi-automatic

pistol on the passenger seat and several compact disks (CDs) in the car.

        Officer Goins suspected the CDs were "pirated," because they were in a "poor quality

made CD case with the labeling."  He requested assistance from two other officers that had

received training concerning CDs.  Minutes later, Officers Barker and Perkins arrived.  Officer

Barker testified that he saw CDs on the front passenger seat and on the floorboard of the car.  He

testified that "based on [his] training with the recording industry the thin cases and the homemade labels in the cases led [him] to believe they were bogus CDs." He explained:

> They were thin case CD's and the labels on them were real blurry. You couldn't really make out the reading on them that well. You could just look at them and tell that they were bogus.

Concluding that the CDs were illegitimate, the officers seized the CDs they saw and searched the car for others.

During that search, Officer Goins found two bags under the passenger seat. One bag was clear and held plant material that smelled like marijuana. The state laboratory later identified the substance as 3.79 ounces of marijuana. The other bag contained $324 in cash. The Commonwealth charged McLaughlin with possession of marijuana with intent to distribute.

At trial, McLaughlin filed a motion to suppress the evidence of the marijuana. The Commonwealth defended the police action as an enforcement under Code § 59.1-41.5. A private investigator with specialized training "in the detection of bogus recordings" testified on behalf of the Commonwealth, explaining his conclusion that the CDs were pirated. At the conclusion of the evidentiary hearing, the trial judge denied the motion to suppress. In part, he ruled as follows:

> Well, the officer saw in plain view CD's, or at least the thin CD packaging material . . . . I think he had, at that point . . . the officer sees what he thinks are these bogus CD's, and apparently a fairly large number of these things. And once he gets into the vehicle they continue searching in those areas where they see more and more of these disks. I think the officer is under the totality of the circumstances here; once they saw what they believed to be and what turned out to be correctly identified as bogus CD's—and I use the term "bogus" to include "pirated, counterfeit and bootleg."

McLaughlin later testified that he did not know of the marijuana and money in the car. He said he did not own the car, but had borrowed it that day. He explained that he leaned over the passenger seat as Officer Goins approached in order to ensure that his gun was visible. The

- 2 -

trial judge rejected McLaughlin's testimony and convicted him of possessing marijuana with intent to distribute under Code § 18.2-248.1.

## II.

McLaughlin appeals the trial judge's denial of his motion to suppress the evidence. He contends the "only justification for the search was that [the officers] observed the cases were slimline and the packaging graphics/wording were blurry, which led them to believe the CDs were bogus." In response, the Commonwealth argues that the officers had probable cause under Code § 59.1-41.5 to seize the CDs because they had a reasonable basis to believe the "CDs in McLaughlin's car were bogus . . . because of their slim cases and poor quality labels" and did not need a reasonable basis to believe the CDs were possessed for any particular purpose.

In our review, we must give deference to the trial judge's factual findings and consider the evidence "in the light most favorable to the Commonwealth, the prevailing party at trial." Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004). However, the constitutionality of a seizure involves questions of law and fact, and, thus, we must "independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." Id.

Code § 59.1-41.5 obligates "all law-enforcement officers, upon discovery, to confiscate all recorded devices that do not conform to the provisions of § 59.1-41.4." Code § 59.1-41.4 provides, in part, that "every recorded device sold, rented or transferred or possessed for the purpose of sale, rental or transfer . . . shall contain on its packaging the true name and address of the manufacturer." In other words, police officers can seize recorded devices possessed for the purpose of sale, rental, or transfer that are not properly labeled with the manufacturer's name and address.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). To invoke the plain view doctrine, however, the police must have probable cause to believe the evidence seized was evidence of a crime or contraband. Arizona v. Hicks, 480 U.S. 321, 326 (1987). "[T]he Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." Minnesota v. Dickerson, 508 U.S. 366, 376 (1993).

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

Texas v. Brown, 460 U.S. 730, 742 (1983).

In determining whether probable cause exists, we are required to focus upon what the circumstances meant to trained police officers. Brown v. Commonwealth, 270 Va. 414, 419, 620 S.E.2d 760, 762 (2005). Nevertheless, an officer's determination of probable cause must be based on "'objective facts.'" Derr v. Commonwealth, 6 Va. App. 215, 220, 368 S.E.2d 916, 918 (1988) (quoting United States v. Ross, 456 U.S. 798, 808 (1982)). "[S]uspicion, or even 'strong reason to suspect'" is not enough to constitute probable cause. See Henry v. United States, 361 U.S. 98, 101 (1959). Thus, applying the Texas v. Brown standard and the statute the officers purported to act upon in this case, we must ask whether the facts available to the police officers would warrant a person of "reasonable caution" to believe that the CDs were "possessed for the purpose of sale, rental or transfer" and did not have packaging with the manufacturer's name and address.

- 4 -

Denying the motion to suppress, the trial judge found that "the officer saw in plain view CD's, or at least the thin CD packaging material" and that he saw "a fairly large number of these things." The judge also found that the officer "thought they were [bogus] based on what he could observe in plain view." The objective facts establish that the officers saw CDs and CDs in "slimline" cases, a thinner version of the standard clear plastic "jewel case" used for CDs. The inserts on the CD cases denoting the contents were comprised of a relatively poor print quality. Officer Barker explained that the labels appeared "homemade." By Officer Barker's own testimony, he concluded they were "bogus" merely because he saw "thin case CDs and the labels on them were real blurry."

Reversing a trial judge's finding that the police had probable cause, the Supreme Court in Brown v. Commonwealth noted:

> We have considered a number of instances in which an officer's expertise and training made his observation of an item suspected to contain contraband a significant factor in the probable cause analysis. In none of these cases, however, has that fact alone supported a finding of probable cause when the suspicious item is also capable of legitimate use.

270 Va. at 420, 620 S.E.2d at 763. The Court explained "that for the last 25 years, [it] has consistently declined to find that probable cause can be established solely on the observation of material which can be used for legitimate purposes, even though the experience of an officer indicates that such material is often used for illegitimate purposes." Id. at 420-21, 620 S.E.2d at 763.

Those principles are applicable in this case because, while the homemade appearance of a recording may lead a person to believe it is not fully labeled, no facts in the record suggest the CDs were possessed "for the purpose of sale, rental or transfer," and thus in violation of Code § 59.1-41.4. Likewise, no facts in the record indicate the officers either believed or had any reason to believe the CDs were possessed for one of those purposes. As in Brown, we cannot

- 5 -

find probable cause based solely on suspicious items that could be legitimate. The CD cases the officers saw are somewhat scruffy and scratched. None of the CD cases or individual CDs appear to be newly acquired or to have any of the usual indicia of items being held for sale. They contain no pricing labels, no cellophane wrapping, no boxes, and no customer lists. None of the CDs were duplicates of others. Indeed, the officer testified that the forty CDs seized "were all different." These facts indicate the CDs were possessed for personal use instead of sale, rental, or transfer.

Many of the CDs the officers saw in the car can be purchased "blank" (that is, to be used for home recording) at a variety of retail stores that sell music recordings or office supplies. They have brand names such as "imation," "memorex," "staples:www.staples.com," and "maxell." That type of CD is purchased commercially and used by countless people who legitimately "burn" CDs for their personal use. Many of the CDs have words handwritten on them in black ink, such as "Da Band," "JAZZ," and "SLOW JAMS 3." Indeed, the private investigator, who did not play any of the CDs, acknowledged that he had "seen completely legal slimline case burned CDs where bands will do their own thing and put out their own music." He also explained:

> DJ mixes they are often called, which is where you take several artists and you make a CD from that. They are done legitimately many times. The DJ mixes are . . . we see a lot of that, and I would say that probably more than anything else that we see in illegal music are DJ mixes . . . . The DJ mix does not exist anywhere else except by the person that's making it . . . . These I found to be either principally, if not all, there were a couple I wasn't quite sure of; it's possible there might have been one or two counterfeits because I wasn't sure of the title, but all the rest are . . . DJ mixes. And they all were what are called burned disks when a disk is made . . . a compact disk is made . . . . These were all . . . all of these were burned disks . . . what we call burned disks . . . . The recording industry as a whole does not burn disks; they press disks . . . . These were all burned disks.

Although the private investigator concluded that the CDs he had not listened to were "pirated," his testimony established that these primarily were "burned" disks that can be legitimately created. Likewise, slimline cases can be purchased in retail stores and, when used, often contain homemade labels or pictures to indicate the contents of the enclosed CDs. Simply put, this testimony is graphic illustration of the process a person with a legitimate home recorder would engage in when lawfully downloading music or creating a mix of music onto a "burned" CD.

In sum, the facts in this case, which also describe legitimate CDs, are insufficient to establish that the police had probable cause to seize the CDs. Due to the quality of the casing and print on the inserts, the CDs look homemade. They do not look like retail products sold by any major recording studio. However, a CD's homemade appearance is not enough to warrant a person of reasonable caution to believe that it is contraband. The officers' view of the items did not give them reason to believe the CDs did not have the true manufacturer's name and address *and* were "sold, rented or transferred or possessed for the purpose of sale, rental or transfer." Code § 59.1-41.4.

The Commonwealth's argument (that to lawfully seize the CDs the police did not need a reasonable basis to believe that the CDs were sold, rented, transferred, or possessed for one of those purposes) ignores the language of the statute limiting the types of recording devices that must be labeled. Code § 59.1-41.4 reads in its entirety as follows:

> Ninety days after July 1, 1972, every recorded device sold, rented or transferred or possessed for the purpose of sale, rental or transfer by any manufacturer, distributor, or wholesale or retail merchant shall contain on its packaging the true name and address of the manufacturer. The term "manufacturer" shall not include the manufacturer of the cartridge or casing itself. The term "recorded device" means the tangible medium upon which sounds or images are recorded or otherwise stored, and includes any phonograph record, disc, wire, tape, videocassette, film or other

medium now known or later developed on which sounds or images
are recorded or otherwise stored.

The statute does not require manufacturer labeling on all recordings. It requires it on recorded devices "sold, rented or transferred or possessed for the purpose of sale, rental or transfer." Id. For the police to have probable cause to seize an item in violation of the statute, they must have probable cause to believe that item violates the statute, not just believe the item might be homemade or inconsistent with a part of the statute.

We cannot simply ignore the language narrowing the statute to proscribe recording devices "sold, rented or transferred or possessed for the purpose of sale, rental or transfer." Id. To do so would unacceptably broaden the statutory couplet of Code §§ 59.1-41.4 and 59.1-41.5 to *obligate* law enforcement officers to confiscate all recordings lacking identification of their manufacturers. An interpretation that ignores the limiting language impermissibly sweeps within the statute's ambit a long list of legitimate, lawful items that may not typically be labeled with the manufacturer's name and address: CDs legally created from music purchased and downloaded from music internet sites; "mixed" CDs or cassette tapes legally created for personal use by compiling songs from purchased CDs; CDs created as back-up for a computer hard drive, that may contain sounds or images; CDs created of digital photographs taken on a personal camera; personally produced CDs or cassette tapes of music; CDs created from music or images available without legal restrictions online; MPEG Audio Layer 3 devices (commonly referred to as MP3 players), which contain audio or video files transferred from a computer; a cassette tape recording of a meeting; and home videos.

The legislature created the code chapter at issue in order to deter infringements on intellectual property rights.[1] As such, logic suggests that the legislature intended to tailor Code

_____

[1] See Title 59.1, Trade and Commerce, Chapter 3.1. Only four statutes are in this chapter, in addition to the two statutes at issue in this case. All six statutes pertain to recorded

§ 59.1-41.4 for its purpose of discouraging illegal recordings and did not broadly aim to discourage nondescriptive labels on all types of recordings. Indeed, during the hearing on the motion to suppress, the police officers did little to clarify in what specific way the CDs seemed illegitimate. One officer said they contained "pirated" music, another testified they were "bootleg" or simply described them as "bogus." Neither officer had listened to or played any of the CDs. The private investigator testified that "illegal CDs are principally grouped into three areas": counterfeit, which he defined as an illegal copy of an "actual CD in the marketplace"; bootleg, which he defined as an unauthorized recording of a concert; and pirated, which contains unauthorized reproductions of copyrighted work. However, none of the officers testified as to any facts or observations suggesting that the CDs they saw were not lawfully homemade.

By accepting the Commonwealth's argument, we would subject to seizure lawfully "burned" CDs merely because they appear to a police officer to be not commercially produced. We hold that the statute does not support such a seizure and that, to lawfully seize items under Code § 59.1-41.5, the officers must have had probable cause to believe that the CDs were not properly labeled *and* that they were "sold, rented or transferred or possessed for the purpose of sale, rental or transfer." Because the police officers lacked probable cause to seize the CDs and to search the car, the trial judge improperly admitted the evidence of the presence of marijuana in the car. See Matthews v. Commonwealth, 218 Va. 1, 3, 235 S.E.2d 306, 306 (1977) (holding that the police officer did not have probable cause to search a brown paper bag because it was equally rational to believe the bag contained legal substances as to believe it contained contraband).

---

devices. Code § 59.1-41.1 defines "owner." Code § 59.1-41.2 prohibits recording for profit a concert without the owner's consent. Code § 59.1-41.3 prohibits selling or renting recorded devices that violate the chapter, or possessing them for such a purpose. Code § 59.1-41.6 lists the penalties for violating the chapter. Code § 59.1-41.2, regarding unauthorized concert recordings, particularly reveals the legislature's concern about intellectual property rights.

Accordingly, we hold that the trial judge erred in denying McLaughlin's motion to suppress the evidence, and we reverse the conviction for possession of marijuana with intent to distribute. In view of this disposition, we need not consider whether the evidence was sufficient to support the conviction.

Reversed and dismissed.

Kelsey, J., dissenting.

Properly framed, the question presented by this case asks only whether the officers had probable cause to believe the CDs were subject to confiscation under Code § 59.1-41.5. Without contradiction, the evidence established that the observable characteristics of these CDs made them clearly recognizable as pirated "DJ mixes" — the kind most frequently traded in the black market. The trial court, therefore, properly denied McLaughlin's suppression motion.

I.

Under settled principles, we address the legal issues arising from a suppression motion "only after the relevant historical facts have been established." Logan v. Commonwealth, 47 Va. App. 168, 171, 622 S.E.2d 771, 772 (2005) (*en banc*). "On appeal from a denial of a suppression motion, we must review the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Kyer v. Commonwealth, 45 Va. App. 473, 477, 612 S.E.2d 213, 215 (2005) (*en banc*) (citation omitted).

After making a traffic stop, Officer Clarence Goins approached the driver's side to question McLaughlin, the only person in the vehicle. As Goins approached, McLaughlin made a "movement toward the right passenger side seat." Arriving at the driver's side window, Goins observed a .45 caliber semi-automatic handgun next to McLaughlin. Goins also saw in the vehicle what he immediately suspected to be "pirated" music CDs. Wanting to confirm his suspicions, Goins called for back-up officers who had received "specialized training in the detection of such bogus CDs." These officers arrived two to three minutes later.

Without entering the vehicle, one of the officers saw similar CDs "all laid spread out all over the car." Some could easily be seen both on "the seat and the floorboard." The officers also noticed that the CDs were packaged in "slimline" plastic cases with "real blurry" paper insert covers — both "highly unusual" characteristics for legitimate CDs. Relying on their

specialized training, the two officers concurred with the patrol officer's conclusion that the CDs were "pirated" and should be confiscated.

After making this determination, the officers entered the vehicle to confiscate the CDs, forty in all. One of the officers reached under the right passenger seat to remove CDs that "were sticking out from under the edge of the seat." While doing so, he saw two other suspicious items and alerted Officer Goins to retrieve them. One was a bag of marijuana, the other a bag containing a "large quantity of money." At that point, the officers arrested McLaughlin for possession of marijuana with intent to distribute.

McLaughlin moved to suppress the evidence, arguing that the officers had no probable cause to believe he was committing any crime associated with the CDs and thus had no legal justification to search the vehicle. In response, the Commonwealth argued that the officers had probable cause to believe the CDs were "pirated" recordings subject to confiscation. Supporting this assertion, the Commonwealth presented expert testimony from a retired police officer trained in the "detection of bogus recordings, including CDs" and the specific attributes of "pirated" CDs.

The expert confirmed the police officers' understanding of the "slimline" cases and blurred insert covers as characteristics of "pirated" CDs. He testified that no major label in the recording industry packages music CDs in "slimline" cases. "Nobody uses them," the expert explained. He also pointed out that the insert covers reveal the recordings to be "DJ mixes" of "major artists" from "major labels." The blurring occurred when the insert covers were "scanned into a computer and then printed out." This process caused a noticeable "degradation of the graphics" on the finished product.

These unique circumstances, the expert testified, made these pirated CDs "very easily identified." "Sometimes they are sophisticated," he said, "these were not." He was "absolutely"

certain these CDs could be identified as pirated "DJ mixes" from a visual observation. In the black market, "probably more than anything else that we see in illegal music are DJ mixes." This particular form of piracy, he explained, violates state anti-piracy statutes requiring CDs to disclose "the true name and address of the actual manufacturer." None of the "DJ mixes" found in McLaughlin's vehicle complied with this requirement, the expert concluded.

After examining the CDs described by the officers, the trial court agreed with the Commonwealth. Holding that the CDs were lawfully confiscated and the inadvertent discovery of the bags of marijuana and money occurred during the confiscation process, the trial court denied McLaughlin's motion to suppress. The trial judge later found McLaughlin guilty of possession of marijuana with intent to distribute in violation of Code § 18.2-248.1.

II.

CONTRABAND SEIZURE DOCTRINE & PIRATED CDs

On appeal, McLaughlin argues that the officers did not have probable cause to believe he violated any federal or state intellectual property laws and that these laws, in any event, "do not outlaw simple *possession* of illegal CDs." Appellant's Br. at 20 (emphasis added). Lacking probable cause to believe he committed any crime, McLaughlin concludes, the officers violated the Fourth Amendment when they searched his vehicle. The trial court rejected this reasoning, as do I.

An officer may confiscate contraband without any probable cause implicating the criminality of the possessor. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Wyoming v. Houghton, 526 U.S. 295, 302 (1999) (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)). "The right to search and the validity of the seizure are not dependent on the

right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." Zurcher, 436 U.S. at 557 (quoting Carroll v. United States, 267 U.S. 132, 158-59 (1925)). It simply misses the point, therefore, to assert "that property may not be searched unless its occupant is reasonably suspected of crime and is subject to arrest." Id. at 559.

The question before us, then, is not whether the officers had probable cause to suspect McLaughlin illegally possessed pirated CDs, but whether they had probable cause to believe the CDs in McLaughlin's vehicle were of the type that could be lawfully confiscated.[2] The evidence at the suppression hearing establishes that they did.

Code § 59.1-41.5 mandates that "it shall be the duty of all law-enforcement officers, upon discovery, to confiscate all recorded devices that do not conform to the provisions of § 59.1-41.4." Under Code § 59.1-41.4, "every recorded device sold, rented or transferred or possessed for the purpose of sale, rental or transfer by any manufacturer, distributor, or wholesale or retail merchant shall contain on its packaging the true name and address of the manufacturer." This is one of several statutes dealing with "pirated or mislabeled recordings" distributed in Virginia. See Roger Douglas Groot, Criminal Offenses & Defenses in Virginia 967 (2006).

Patterned after similar state anti-piracy laws,[3] Code § 59.1-41.4 seeks to deter intellectual property theft by requiring all manufacturers of recordings (including unauthorized copiers) to

---

[2] For just this reason, the majority's reliance on cases like Brown v. Commonwealth, 270 Va. 414, 620 S.E.2d 760 (2005), is off the mark. Brown dealt with probable cause for purposes of justifying an arrest — not probable cause for suspecting an item to be within the scope of a civil confiscation statute.

[3] See Ala. Code § 13A-8-83 (2005); Ariz. Rev. Stat. § 13-3705 (2005); Cal. Pen Code § 65w (2006); Colo. Rev. Stat. § 18-4-604 (2005); Conn. Gen. Stat. § 53-142c (2004); Del. Code Ann. tit. 11, § 922 (2005); D.C. Code § 22-3214.01 (2006); Fla. Stat. § 540.11 (2005); Idaho Code Ann. § 18-7603 (2005); Ind. Code § 24-4-10-4 (2005); Kan. Stat. Ann. § 21-3750 (2005);

make a specific and "true" self-disclosure.  See generally State v. Moghrabi, 775 A.2d 519, 524 (N.J. Super. Ct. App. Div. 2001) (holding that a "manufacturer" under New Jersey's anti-piracy statute "obviously refers to the maker" of the unauthorized copy); Milteer v. Commonwealth, 267 Va. 732, 738-39, 595 S.E.2d 275, 278-79 (2004) (employing, without further comment, the maker interpretation of "manufacturer").

Under the confiscation statute, a prior transfer makes the music recording every bit as illegitimate (and thus subject to confiscation) as an intended future transfer, regardless of who possesses it at the time of confiscation.  See generally Calero v. Pearson Yacht Leasing Co., 416 U.S. 663, 682-87 (1974) (noting that the property is "treated as the offender" under statutory forfeiture laws).  The text of Code § 59.1-41.5 confirms this by clarifying that the authority to confiscate exists "regardless" of the lack of criminal *mens rea* under the corresponding criminal offense statute, Code § 59.1-41.3.  See Code § 59.1-41.5 (stating that the confiscation duty applies to "any nonconforming recorded device, regardless of the requirement in § 59.1-41.3 of knowledge or intent of a retail seller").

In this case, the officers had probable cause to believe the CDs in McLaughlin's vehicle failed to "conform to the provisions of § 59.1-41.4."  See Code § 59.1-41.5.  Testimony from the Commonwealth's expert, a former police officer experienced in such things, established that a trained officer would easily recognize these CDs to be pirated "DJ mixes" subject to statutory confiscation.[4]  Packaged in their characteristic "slimline" cases, illegal "DJ mixes" do not

---

La. Rev. Stat. Ann. § 14:223.6 (2005); Mich. Comp. Laws § 752.1053 (2005); Mo. Rev. Stat. § 570.240 (2006); N.J. Stat. Ann. § 2C:21-21 (2005); NY Penal Law § 275.35 (Consol. 2005); N.C. Gen. Stat. § 14-435 (2005); N.D. Cent. Code § 47-21.1-03 (2005); Or. Rev. Stat. § 164.868 (2003); Tenn. Code Ann. § 39-14-139 (2005); Tex. Bus. & Com. Code Ann. § 35.94 (2005); Utah Code Ann. § 13-10-8 (2006); Wash. Rev. Code § 19.25.040 (2005); W. Va. Code § 61-3-50 (2005); Wis. Stat. § 943.209 (2005); P.R. Laws Ann. tit. 33, § 2168 (2004).

[4] See generally Texas v. Brown, 460 U.S. 730, 743 (1983) (relying on expert witness who "corroborated" what the "trained eye" of the seizing officer suggested was contraband).  The

- 15 -

identify the manufacturer by "true name and address" as Code § 59.1-41.4 requires. Making exactly the same assumption underlying the statute itself, the officers could reasonably conclude that intellectual property thieves do not provide such detailed self-disclosures.

The officers also had ample reason to believe that whoever manufactured these "DJ mixes" likely did so (at least likely enough to satisfy probable cause) for the very purpose of distribution. Custom graphic designs appear on the insert covers, like the trade dress one would expect of an item in commerce. The insert covers also feature specific DJ tradenames, no doubt to provide product recognition and thus commercial value in the pirated CD market. The blurred insert covers, moreover, appear to have been "scanned into a computer and then printed out."

The probable cause standard requires no more. It does not "deal with hard certainties, but with probabilities." Slayton v. Commonwealth, 41 Va. App. 101, 106, 582 S.E.2d 448, 450 (2003) (citation omitted). Nor does it "demand any showing that such a belief be correct or more likely true than false." Id. at 106, 582 S.E.2d at 450 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the probable-cause decision." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (citation and internal brackets omitted). Police officers, therefore, need not be "possessed of near certainty as to the seizable nature of the items." Brown, 460 U.S. at 741.

Thus, the mere possibility of a wholly innocent explanation does not end the probable cause analysis. It must be an explanation leaving no persuasive room for any other, reasonably

governing objective test does not draw distinctions between probable cause determinations of a "knowledgeable, veteran officer" and those "made by a rookie" officer faced with precisely the same circumstances. Devenpeck v. Alford, 543 U.S. 146, 154 (2004). It asks only what the objective facts would mean "to police officers trained in analyzing the observed conduct for purposes of crime control." Hollis v. Commonwealth, 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976); Taylor v. Commonwealth, 222 Va. 816, 820-21, 284 S.E.2d 833, 836 (1981) (judging probable cause from the perspective of a "trained police officer").

- 16 -

arguable, incriminating explanation. Under the facts of this case, the only plausible innocent explanation assumes someone took the time and energy to

- lawfully download several dozen music compilations of major artists from major labels,
- produce forty or so CDs of these compilations, using custom graphics and designs for each insert cover,
- scan each one of these graphic designs into a computer and then print out a single copy of the *scan* — instead of just printing out directly the graphic design, an easier process producing a sharper, cleaner image,
- think up fictitious names of DJs to help him identify his own compilations,

all for his own listening pleasure. In other words, we would have to conclude that someone succeeded in producing and packaging legal music compilations for his own personal use that, by pure happenstance, look exactly like the kind most often found in the "illegal music" trade. That supposition strikes me as highly unlikely — so much so that the incriminating inferences preponderate far higher than the probable cause standard even requires.

I respectfully dissent.