COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:   Judges Chaney, Callins and White
Argued at Alexandria, Virginia


CHRISTOPHER PATRICK CARTER

                                                   OPINION BY
v.        Record No. 1478-22-2          JUDGE VERNIDA R. CHANEY
                                           DECEMBER 28, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Lon E. Farris, Judge Designate[1]

Meghan Shapiro, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Christopher Patrick Carter entered conditional guilty pleas to firearm possession by a

convicted violent felon and two counts of possession with intent to distribute a Schedule I or II

controlled substance.  The police obtained the evidence supporting these charges during

warrantless searches of Carter's person and vehicle.  Carter contends that the circuit court erred

in denying his motion to suppress this evidence.[2]  This Court agrees.  Accordingly, we reverse

the circuit court's judgment, vacate the convictions, and remand the case to allow Carter to

withdraw his guilty pleas, pursuant to Code § 19.2-254.

---

[1] Judge Joseph J. Ellis presided at the suppression hearing and entered the order denying
Carter's motion to suppress.

[2] Pursuant to Code § 19.2-254, Carter's entry of conditional guilty pleas reserved his right
to appellate review of the circuit court's adverse determination of his suppression motion.

BACKGROUND

This Court reviews the facts in the light most favorable to the Commonwealth, the prevailing party in the circuit court. *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018). We "regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020).

Around 10:00 p.m. on October 31, 2021, while Fredericksburg Police Officer Murphy was on patrol near Interstate 95, he noticed a car near the Super 8 Motel, an area he knew to be frequented by drug users and dealers. Although there was no traffic, the car remained stopped at an intersection for a minute before turning right. Finding this odd, Officer Murphy followed the car and paced it for roughly six-tenths of a mile. He observed the car traveling five miles per hour over the speed limit—50 miles per hour in a 45 mile-per-hour zone. The car then turned into the parking lot of the Quality Inn Motel, which Officer Murphy also knew to be frequented by drug users and dealers. As Officer Murphy also acknowledged, the Super 8 Motel and the Quality Inn Motel were both open, legitimate business establishments located near Interstate 95.

Officer Murphy stopped the car for speeding, finding Carter as the sole occupant. Officer Murphy asked Carter for his license and registration, and Carter produced a valid District of Columbia driver's license and a valid Maryland vehicle registration.

Officer Murphy then asked Carter, "Where are you headed to tonight?" Carter replied, "Right here," pointing at the Quality Inn Motel. Officer Murphy further inquired, "What brings you to the area?" Carter replied that he was visiting friends in the area and his girlfriend was coming from Richmond to meet him there, at the midway point.

Officer Murphy noticed two plastic baggies in the car's center console and asked Carter what they contained. Carter answered, "I have marijuana. Marijuana is legal, right?" Officer

Murphy replied, "Yeah, yeah. Is that all that's in that bag?" Carter lifted the baggies and answered, "Yep." Officer Murphy visually estimated that each bag contained roughly one gram of marijuana.

Officer Murphy returned to his police vehicle to check Carter's license and registration. He also requested a drug-sniffing dog from police dispatch, but none were available.

Officer Murphy started writing a warning ticket, but then reapproached Carter to confirm the address on his driver's license. Carter informed Officer Murphy that he had moved to Maryland, and he provided his updated address. Officer Murphy then returned to his police vehicle to finish checking Carter's information and complete the written warning.

At this point, another marked police vehicle and a second uniformed police officer were present. Rather than completing the warning ticket himself, Officer Murphy directed the assisting officer to complete the written warning so that he could further investigate Carter.

Officer Murphy reapproached Carter and directed him to exit his car. After Carter got out and walked to the front of the police vehicle, Officer Murphy inquired, "Do you [have] any weapons or anything like that on you?" Carter replied, "No, sir." Officer Murphy then asked, "Do you mind if I search you real fast just to make sure? Sir, if that's okay." Carter replied, "Yeah, [you're] all right. You can search me. I don't have any weapons." Carter then faced the police vehicle with his back to Officer Murphy, placed his right hand on the vehicle's hood, and raised his left arm. As Officer Murphy reached into the right pocket of Carter's jacket, the officer asked, "Nothing on you is gonna poke, prick, or stab me?" After Carter replied, "No, sir," Officer Murphy reached into and removed the contents from Carter's left jacket pocket and pants pockets. No weapons were found. After placing the items from Carter's pockets on the hood of his police vehicle, Officer Murphy did a pat-down search of Carter's person. Again, no weapons were found.

The items that Officer Murphy removed from Carter's pockets included a Quality Inn room key, a cell phone, an ID badge, a pack of cigarettes, a set of keys, two empty plastic baggies, a wallet containing cash, and some "folds" or "wads" of cash. The total amount of cash removed from Carter was $294 in various denominations. Some folded cash was removed from two of Carter's pockets. Officer Murphy testified at the suppression hearing that narcotics dealers typically fold the money from each transaction. Officer Murphy did not know whether Carter had more than two "folds" or "wads" of cash.

While searching Carter, Officer Murphy asked, "Is there anything illegal in the car tonight, sir?" Carter replied, "No, sir." Officer Murphy then asked, "Would you mind if I conduct a search of the vehicle?" Carter replied, "I do mind." Officer Murphy clarified, "You said you would not like me to search. That's correct?" Carter answered, "Yes, sir."

After Carter declined to give permission for a vehicle search, Officer Murphy rummaged through the items he had removed from Carter's pockets. Officer Murphy then walked to the other police vehicle and again requested a drug-sniffing dog from police dispatch.

While Officer Murphy was again trying to get a narcotics dog, his police supervisor drove into the motel parking lot and parked. His supervisor advised him that he had gone "too far unless you get us something major." Then Officer Murphy turned off his body-worn camera ("bodycam") and conversed privately with his supervisor "about the scope of the stop and what [he] had found thus far." After about six minutes, Officer Murphy turned his bodycam back on.

After speaking with his supervisor, Officer Murphy reapproached and resumed questioning Carter. A third uniformed police officer then approached and stood near Carter. At this point, more than ten minutes had passed since Officer Murphy directed the assisting officer to finish writing Carter's warning ticket for speeding.

When Officer Murphy resumed questioning Carter, he first asked Carter about the money and plastic baggies that the officer had removed from Carter's pockets. Carter responded that he planned to use the baggies when he bought marijuana. Officer Murphy then asked whether the car contained any marijuana other than the two baggies that he previously observed in Carter's car. Carter replied, "No, that's it. I just had . . . a small amount of marijuana." Officer Murphy then said, "Explain to me why you were coming from Super 8?" Carter answered, "I met somebody down there." Officer Murphy then inquired about Carter's girlfriend's whereabouts, and Carter again told the officer that his girlfriend was traveling there from Richmond. Officer Murphy asked where they were staying, and Carter again told the officer that they were staying there at the Quality Inn. After Carter identified his motel room number, Officer Murphy asked whether he had a key card. Carter reminded Officer Murphy that the officer had removed his room key from his pocket. In response to further questioning, Carter told Officer Murphy the name and room number of his friend who was staying at the Super 8 Motel.

After questioning Carter, Officer Murphy told him that he was going to do "a probable cause search" of his car. In searching Carter's car, the police found cocaine, heroin, a firearm, two digital scales, and over 300 unused baggies in various sizes. The police then arrested Carter and charged him with felony drug and firearm offenses.

Carter moved the circuit court to suppress the incriminating evidence found during the warrantless searches of his person and vehicle. Following an evidentiary hearing, the circuit court denied Carter's suppression motion. Pursuant to a plea agreement, Carter entered conditional guilty pleas that preserved his right to appeal the circuit court's order denying his motion to suppress. The circuit court sentenced Carter to incarceration for 28 years with 20 years suspended. This appeal followed.

ANALYSIS

Carter contends that the circuit court erred in denying his suppression motion because (1) the police unlawfully searched his person beyond the scope of his consent to a weapons search; (2) the police unlawfully searched his car without probable cause; and (3) the police unconstitutionally extended the traffic stop beyond the duration required to address the legitimate reason for the stop. On appeal of an order denying a motion to suppress evidence, this Court "determine[s] whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." *Merid v. Commonwealth*, 72 Va. App. 104, 108 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)), *aff'd*, 300 Va. 77 (2021). Carter's "claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact." *Id.* at 108-09 (quoting *King v. Commonwealth*, 49 Va. App. 717, 721 (2007)). This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at 109 (quoting *Cantrell*, 65 Va. App. at 56). "However, the Court reviews *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020)).

I. The police searched Carter beyond the scope of his consent to a weapons search.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are presumptively unreasonable. *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). However, a warrantless search authorized by consent is valid under the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "A consensual search

is reasonable if the search is within the scope of the consent given." *Edwards v. Commonwealth*, 38 Va. App. 823, 827 (2002) (quoting *Grinton v. Commonwealth*, 14 Va. App. 846, 850 (1992)).

"Both the presence of consent to search and any related limitations are factual issues for the trial court to resolve after consideration of the attendant circumstances." *Id.* (quoting *Bynum v. Commonwealth*, 23 Va. App. 412, 418 (1996)). The scope of a person's consent under the Fourth Amendment is measured by a standard of "'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Bolda v. Commonwealth*, 15 Va. App. 315, 317 (1992) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Also, "[t]he scope of a search is generally defined by its expressed object." *Id.* (alteration in original) (quoting *Jimeno*, 500 U.S. at 251).

This Court holds that the police unconstitutionally searched Carter beyond the scope of his consent to a weapons search. Officer Murphy's bodycam video shows that after he directed Carter to get out of his car, they had the following exchange:

> OFFICER MURPHY: "Do you [have] any weapons or anything like that on you?"
>
> CARTER: "No, sir."
>
> OFFICER MURPHY: "Do you mind if I search you real fast just to make sure? Sir, if that's okay."
>
> CARTER: "Yeah, [you're] all right. You can search me. I don't have any weapons."

A reasonable person considering this exchange would understand Carter's consent to be limited to a search for weapons. The scope of this search was defined by its expressed object—weapons. Officer Murphy asked to quickly search Carter "to make sure" he had no weapons. Carter's affirmative response—which was immediately followed by his verbal assurance that he had no weapons—"could only reasonably have been related to the scope of the request." *Bolda*, 15 Va. App. at 317.

As Officer Murphy reached into Carter's jacket pocket, he asked, "Nothing on you is gonna poke, prick, or stab me?" Carter replied, "No, sir." This exchange did not expand the scope of Carter's consent beyond a search for weapons. Rather, Officer Murphy merely sought Carter's assurance that he would not be injured by any sharp objects as he searched Carter for weapons.

Given the exchange between Officer Murphy and Carter, it is objectively unreasonable to conclude that Carter consented to a general search rather than a limited search for weapons. *See Bolda*, 15 Va. App. at 317. In *Bolda*, the officer requested the defendant's consent to a search of his person immediately after asking whether he had any weapons on him. *Id.* This Court held in *Bolda* that "[t]he method and order" of the officer's questions "implied only a concern about weapons," and these "circumstances prove[d] an implicit limitation on [the defendant's] consent, limiting [the officer] to a search only for weapons." *Id.* Here, Carter negatively responded when the officer asked whether he had any weapons on him, and then the officer immediately asked to search Carter "real fast just to make sure." As in *Bolda*, the circumstances related to the officer's request to search show that the corresponding consent to search was limited to a search for weapons.

Contrary to the Commonwealth's contention, Officer Murphy's earlier inquiries about drugs did not expand the scope of the requested search and corresponding consent beyond a search for weapons. It is objectively unreasonable to consider the officer's request to search Carter "real fast just to make sure" he had no weapons to include a request to search Carter for drugs. Thus, it is objectively unreasonable to conclude that Carter consented to "a more generalized search of his person" for evidence of criminal drug activity.

Officer Murphy exceeded the scope of Carter's consent to a weapons search when he removed the contents of Carter's pockets. "To justify removal of an object from a person's

clothing during a search for weapons, 'the officer [must] reasonably believe[] the object could be a weapon.'" *Bolda*, 15 Va. App. at 317 (alterations in original) (quoting *Lansdown v. Commonwealth*, 226 Va. 204, 213 (1983)). However, as the circuit court noted, Officer Murphy removed the items from Carter's pockets after he "put his hands in the pockets and realized it wasn't a weapon." Because Officer Murphy did not reasonably believe that the cash, plastic baggies, and other items removed from Carter's pockets could be weapons, Officer Murphy exceeded the scope of Carter's consent to a search for weapons.[3]

The Commonwealth contends that Carter "allow[ed] Officer Murphy access to his pockets" and "agreed to a more generalized search of his person, not just a pat down for weapons" when, in addition to his verbal exchange with Officer Murphy, he "turned . . . facing the police vehicle and raised both arms." Appellee's Br. 17-18. We disagree. Although the evidence supports the circuit court's finding that Carter's consent was not limited to a *pat-down* search for weapons, the evidence does not support a finding that Carter consented to a *general* search of his person, rather than a weapons search. After verbally consenting to a weapons search, Carter positioned himself to facilitate that search. Carter did not thereby expand the scope of the search beyond a search for weapons.

The Commonwealth also argues that Carter consented to a general search of his person when he made no objection as Officer Murphy removed the contents of his pockets. Again, we disagree. It is well established that "[c]onsent to a search . . . must be unequivocal, specific and intelligently given . . . and it is not lightly to be inferred." *Jean-Laurent v. Commonwealth*, 34 Va. App. 74, 78 (2000) (second and third alterations in original) (quoting *Elliotte v.*

---

[3] The circuit court noted that Officer Murphy removed the items from Carter's pockets after he "put his hands in the pockets and realized it wasn't a weapon." Nonetheless, the circuit court ruled, "[T]hat would not be a grounds of which the Court would find that the search was inappropriate."

*Commonwealth*, 7 Va. App. 234, 239 (1988)). "Although the consent need not be oral, mere acquiescence is not enough." *Id.* "Additionally, the Commonwealth bears the burden of proving that consent was in fact given." *Id.* Carter was not required to object to the seizure of his pockets' contents "to preserve the non-consensual nature of the seizure." *See id.* at 80. "The burden was upon the officer to obtain consent, not on [the defendant] to affirmatively deny consent." *Id.*

The Commonwealth's contention that Carter impliedly consented to the general search of his person by not objecting at the time of the search is not supported by the cases on which the Commonwealth relies. The Commonwealth cites *Lawrence v. Commonwealth*, 17 Va. App. 140 (1993), *aff'd*, 247 Va. 339 (1994), for the proposition that a defendant's "'[f]ailure to object to the continuation of the search' is evidence that 'the search was within the scope of the consent.'" Appellee's Br. 18 (quoting *Lawrence*, 17 Va. App. at 146). However, this partial quotation from *Lawrence* omits essential words that refer to the particular circumstances of the defendant's interaction with the officer: "Failure to object to the continuation of the search *under these circumstances* may be considered an indication that the search was within the scope of the consent." *Lawrence*, 17 Va. App. at 146 (emphasis added) (quoting *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986)).[4] In *Lawrence*, the particular circumstances supporting an inference that the defendant consented to the general search of his pants pocket included the facts that (i) the defendant gave the officer "consent to search his person for illegal narcotics or weapons" and, subsequently, (ii) the defendant said and did nothing to withdraw his prior consent when the officer searched his pants pocket. *See id. Under those circumstances*, it was

---

[4] At issue in *Lawrence* was whether the defendant voluntarily consented to a police search of his pants pocket, where the police found 38 packets of heroin. *See Lawrence*, 17 Va. App. at 141.

objectively reasonable to conclude that the officer's search of the defendant's pants pocket was within the scope of the defendant's consent to search his person for illegal drugs.

The Commonwealth also relies on *Grinton v. Commonwealth*, 14 Va. App. 846, 851 (1992), to support its contention that the scope of Carter's consent to a search may be inferred from his "passive acquiescence" to the officer's general search of his person. The Commonwealth's reliance on *Grinton* is also misplaced. In *Grinton*, the defendant and his co-defendant, Arthur Treadwell, were traveling in a rented car when they had a voluntary police encounter at a toll booth.[5] *Grinton*, 14 Va. App. at 848. Treadwell agreed to allow the officer to "look at the contents and containers" in the vehicle and voluntarily drove to the shoulder of the highway to facilitate the vehicle search. *Id.* When Treadwell claimed that he did not have a key to the trunk, the officer removed the back seat to access the trunk. *Id.* "During the search of the car, neither of the defendants made any attempt to stop the search or to prevent the officer from looking into the trunk." *Id.* at 849. Under these circumstances—where the defendants' prior consent to a general search of the vehicle was not withdrawn—it was objectively reasonable for the officer to infer from the defendants' "passive acquiescence" to the search of the trunk that this search was within the scope of the consent to search the vehicle. *Id.* at 851.

In contrast with the circumstances of the consensual searches in *Lawrence* and *Grinton*, Carter did not give prior consent to a general search of his person. Under these circumstances where Carter's prior consent to search was limited to a search for weapons, it is objectively unreasonable to conclude that Carter exhibited "passive acquiescence" to the officer's general search of his pockets. Because Carter did not give prior consent to a general search of his person, it is objectively unreasonable to infer that the intrusive search of his pockets was within

---

[5] The appeals of Grinton and Treadwell were consolidated and decided by the same opinion of this Court.

the scope of his consent to a weapons search. Therefore, Officer Murphy's general search of Carter's pockets exceeded the scope of his consent to a search, in violation of Carter's Fourth Amendment right against unreasonable searches. Thus, the circuit court should have suppressed this evidence and given it no consideration when determining whether there was probable cause to search the vehicle. *See Bolda*, 15 Va. App. at 319.

## II. The police lacked probable cause to search Carter's car.

A warrantless search of an automobile detained in a traffic stop is permissible under the Fourth Amendment when the police have probable cause to search the vehicle. *See Curley v. Commonwealth*, 295 Va. 616, 621 (2018) (citing cases). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 622 (quoting *Jones v. Commonwealth*, 277 Va. 171, 178 (2009)). "'[S]uspicion, or even "strong reason to suspect"' is not enough to constitute probable cause." *McLaughlin v. Commonwealth*, 48 Va. App. 243, 249 (alteration in original) (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)), *adhered to on reh'g en banc*, 49 Va. App. 103 (2006).

This Court determines de novo whether the police had probable cause to search Carter's car, while deferring to the circuit court's factual findings. *See Curley*, 295 Va. at 621. To determine whether the totality of the relevant facts and circumstances amounts to probable cause, we consider the facts and circumstances "from the standpoint of an objectively reasonable police officer." *Id.* at 622 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018)).

Probable cause to search Carter's car cannot be based on the unconstitutionally obtained evidence that should have been suppressed. To the extent that purported probable cause for a search is based on evidence that should have been suppressed, the evidence found during the search should be suppressed as "fruit of the poisonous tree." *See Commonwealth v. Ealy*, 12 Va. App. 744, 754 (1991) (the exclusionary rule excludes both the "evidence acquired during

an unlawful search, . . . [and] derivative evidence 'that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search.'" (quoting *Murray v. United States*, 487 U.S. 533, 536-37 (1988))).  Therefore, given our holding that the evidence found in Carter's pockets should have been suppressed, we do not consider this evidence in determining whether the police had probable cause to search Carter's car.

In denying Carter's suppression motion, the circuit court ruled that the grounds for the vehicle search were "exceedingly thin, but enough."  We disagree.  Considering the totality of the facts and circumstances leading up to the search of Carter's car—excluding the tainted evidence unconstitutionally taken from Carter's pockets—this Court holds that the police lacked probable cause to search Carter's car.[6]

The properly considered facts and circumstances include the following:

- Carter was driving around 10:00 p.m.[7]

- Carter was driving near Interstate 95 in Fredericksburg.

- Carter resided in Maryland.

- Carter remained stopped at an intersection for a full minute when there was no traffic.

- Carter traveled between two motels near Interstate 95, both of which were frequented by drug users and dealers.

- Both motels were legitimate business establishments that were open for business.

---

[6] In reaching this conclusion, this Court neither holds nor suggests that the totality of the facts and circumstances, *including* the evidence unconstitutionally taken from Carter's pockets, amounts to probable cause to search Carter's car.

[7] The circuit court found that Officer Murphy stopped Carter "near midnight."  But Officer Murphy's testimony and bodycam video establish that he stopped Carter at approximately 9:49 p.m.

- Carter was speeding five miles per hour over the speed limit as he traveled between the motels.

- Carter was staying at the motel where the officer stopped his car.

- Carter possessed two one-gram bags of marijuana in plain view in his car's center console.

- Simple possession of marijuana was lawful at the time of the traffic stop, as Officer Murphy acknowledged to Carter.[8]

- Carter declined to give the police permission to search his car.

Considering these facts and circumstances objectively, a reasonable police officer would not believe that there was a fair probability that Carter's car contained contraband or evidence of a crime. The only unlawful activity that Carter observably engaged in was speeding five miles per hour over the speed limit. Although the officer observed Carter at night at or near two motels frequented by drug users and dealers, Carter's observed conduct—merely driving from one motel to the other—does not support a reasonable belief that Carter was engaged in illegal drug activity. *See McCain v. Commonwealth*, 275 Va. 546, 552 (2008) ("The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped."). Both motels are near a major interstate highway and serve legitimate travel needs of interstate travelers. As an interstate traveler, Carter's presence at the motels around 10:00 p.m.—in conjunction with all the relevant facts and circumstances—does not support a reasonable belief that he was there for an illegal purpose. Finally, Carter's exercise of his right to refuse permission to search his car—considered with the rest of the evidence—does not support a reasonable belief that Carter's car contained contraband or evidence of any crime. Therefore, considering the totality of the relevant facts and circumstances in the light most

_____

[8] Effective July 1, 2021, the General Assembly repealed former Code § 18.2-250.1, the prohibition on marijuana possession. *See* 2021 Va. Acts Spec. Sess. I chs. 550-51, cl. 3.

favorable to the Commonwealth and from the standpoint of a reasonable police officer, the police had no probable cause to search Carter's car.

The Commonwealth contends that Carter's possession of two one-gram bags of marijuana in the front seat of his car, in conjunction with the rest of the evidence, gave the police probable cause to believe that Carter's car contained evidence of criminal drug distribution. The Commonwealth's probable cause determination is flawed because it is based on tainted evidence from the general search of Carter's person, including the "folds" of cash and empty plastic baggies that Officer Murphy removed from Carter's pockets.

The Commonwealth also unreasonably contends that "the absence of any paraphernalia indicating that the marijuana was for personal use," in conjunction with the other evidence, amounts to probable cause to search Carter's car for evidence of drug distribution. Appellee's Br. 20-21. The information that Carter had no paraphernalia for marijuana use on his person was obtained during the unconstitutional search of his pockets. Such "fruit of the poisonous tree" cannot be considered in making a probable cause determination. Moreover, the absence of such paraphernalia on Carter's person does not support a reasonable inference that he intended to distribute the marijuana rather than use it himself. Without the tainted information from the unconstitutional search of Carter's car, there is no factual basis to conclude that his car did not contain paraphernalia for marijuana use. Furthermore, smoking paraphernalia is unnecessary for marijuana consumption since, for example, marijuana can serve as an ingredient in baked goods. Thus, the possession of a small quantity of marijuana, coupled with the absence of smoking paraphernalia on one's person, does not give rise to reasonable suspicion or probable cause to believe that one intends to distribute the marijuana.

Moreover, "probable cause cannot be established 'solely on the observation of material which can be used for legitimate purposes, even though the experience of an officer indicates

that such material is often used for illegitimate purposes.'" *Buhrman v. Commonwealth*, 275 Va. 501, 506 (2008) (quoting *Brown v. Commonwealth*, 270 Va. 414, 420-21 (2005)). Here, as in *Buhrman*, there was no corroborating evidence to support a reasonable belief that the legal substance observed by the officer was evidence of criminal activity. Carter exhibited no nervousness and no elusive or furtive behavior. Rather, Carter openly carried the marijuana in his car's center console and readily acknowledged it to Officer Murphy.

The evidence found in Carter's car should have been suppressed because the warrantless, nonconsensual vehicle search without probable cause violated Carter's Fourth Amendment right against unreasonable police searches. *See McLaughlin*, 48 Va. App. at 254.

CONCLUSION

The police unconstitutionally searched Carter beyond the scope of his consent to a weapons search. Then the police unconstitutionally searched Carter's car based on purported probable cause founded on the evidence from the unconstitutional search of Carter's person. This Court holds that the circuit court erred in denying Carter's motion to suppress the evidence obtained during these unreasonable searches.[9] Accordingly, we reverse the circuit court's order denying the motion to suppress, vacate Carter's convictions, and remand to the circuit court for further proceedings consistent with this opinion, allowing Carter to withdraw his guilty pleas pursuant to Code § 19.2-254.

*Reversed, vacated, and remanded.*

---

[9] This Court does not reach the issue of whether the police unconstitutionally extended the traffic stop because it is not necessary to resolve this issue to decide that the circuit court erred in denying Carter's motion to suppress. *See Ealy*, 12 Va. App. at 754 (declining to reach the issue of whether the defendant's consent to search was voluntary upon holding that "the trial court properly suppressed the evidence based on the 'fruit of the poisonous tree' doctrine"); *see also Alexandria Redevelopment & Hous. Auth. v. Walker*, 290 Va. 150, 156 (2015) (Virginia appellate courts "strive to decide cases on the 'best and narrowest grounds available.'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).