COURT OF APPEALS OF VIRGINIA

Present:   Judges Ortiz, Causey and Callins
Argued at Lexington, Virginia


PAUL EARNEST PRATER, JR.
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1846-24-3                      JUDGE DOMINIQUE A. CALLINS
                                                    MARCH 3, 2026
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
K. Mike Fleenor, Jr., Judge

Courtney Griffin Roberts (Naomi R. Huntington; Huntington,
Huntington & Huntington, on brief), for appellant.

David A. Stock, Senior Assistant Attorney General (Jason S.
Miyares,[1] Attorney General, on brief), for appellee.


Paul Earnest Prater, Jr., appeals the trial court's judgment convicting him of one count of

possession of a Schedule I or II controlled substance.  He argues the trial court should have

suppressed glass smoking devices recovered during a traffic stop and associated search.  He

contends that the traffic stop was unlawfully prolonged and that the search was unsupported by

probable cause.  Finding no error, we affirm the trial court's judgment.

BACKGROUND[2]

Around 1:30 a.m. in January 2024, Montgomery County Sheriff's Deputy Devin Craven

was on patrol when he observed two individuals sitting in a vehicle outside of a truck stop.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] When reviewing the denial of a motion to suppress, we consider the facts in the light
most favorable to the Commonwealth.  *Turay v. Commonwealth*, 79 Va. App. 286, 292 n.1
(2023) (en banc).

Deputy Craven knew this truck stop to experience a "high frequency of drugs and narcotics violations," and the vehicle was parked in a "fairly dark location." Deputy Craven searched for the tags on the vehicle—a silver Nissan sedan—returning a result for a brown 2012 Nissan sedan. He then observed the vehicle fail to completely stop before reentering the highway. Based on the issues with the vehicle's tags and the traffic infraction, Deputy Craven initiated a traffic stop. He found Mary Mullins in the driver's seat and Prater in the passenger's seat.

For the first eight minutes of the traffic stop, Deputy Craven explained his reason for pulling Mullins over and requested identification of both occupants. Upon approaching the vehicle, Deputy Craven had observed on Prater's left side an "orange metal tin" resembling containers in which Deputy Craven, in his training and experience, had "located numerous amounts of narcotics and narcotics related items." He also observed an open container of alcohol in the center console of the vehicle.

Mullins claimed that she and Prater were traveling to Texas, despite being stopped as they drove northbound toward Roanoke. In fact, Mullins noted that she and Prater had come from Adams Marke Mobile Home Park, an "area of interest for narcotics violations" in Blacksburg. Mullins also claimed that her wallet was stolen, and therefore she did not have proof of insurance, identification, or registration for the vehicle. But Mullins did admit that she was not licensed to operate a motor vehicle. She produced her title for the vehicle and, after multiple requests, Prater provided his Virginia license.

Deputy Craven then returned to his police cruiser for 11 minutes to verify the information provided to him by Mullins and Prater, and to confer with a colleague who arrived on scene. Dispatch informed Deputy Craven that Prater's license was not valid. Deputy Craven was not initially able to verify ownership of the vehicle, in part because the VIN on Mullins's title did not match the VIN on the vehicle. Verifying Mullins's title was further complicated by her claim

that she was based "in Maryland and DC," but the vehicle was registered in West Virginia, and the vehicle's title was from Virginia. After conferring with his colleague, Deputy Craven determined that he could not permit two unlicensed drivers to continue operating the vehicle and that towing the vehicle would ultimately be necessary.

Deputy Craven informed Mullins and Prater that they would not be permitted to continue operating the vehicle before returning to his colleague to further confer. The two deputies noticed that the orange tin had been moved and expressed concerns that Mullins and Prater may have been taking steps to conceal evidence of narcotics crimes. Based on what the deputies had learned about the whereabouts of Mullins and Prater that night and the deputies' prior experiences, they opted to attempt a consent search of the tin.

Mullins consented to Deputy Craven's request to view the contents of the tin. Among its contents, Mullins revealed two new glass smoking devices that she claimed to have purchased at a shop nearby. She asserted that she intended to use the device for smoking cannabis. Deputy Craven believed she was being "deceitful" since he had "never . . . seen a glass smoking device of this nature being used for any type of marijuana or THC consumption," or for use with any legal substance.

Based on the foregoing facts, the discovery of the glass smoking device, and after taking ten minutes to consult other deputies, Deputy Craven determined he had probable cause to search Mullins's vehicle. During his search of the vehicle, Deputy Craven identified a black Ozark backpack, belonging to both Mullins and Prater. This backpack contained a brown tin with a blue lid. Within this second tin, Deputy Craven discovered glass smoking devices that later tested positive for cocaine and methamphetamine residue. After giving Mullins and Prater *Miranda*[3] warnings, Prater admitted he "usually use[d] what [Mullins]" used, and they both

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

admitted to smoking crack cocaine and sharing the glass smoking devices for that purpose. An hour and fifteen minutes after initiating the stop, Deputy Craven arrested Mullins and Prater.

A grand jury indicted Prater for possession of a Schedule I or II controlled substance. Prior to trial, Prater moved to suppress the glass smoking devices recovered during Deputy Craven's traffic stop and search. He argued that the traffic stop was unlawfully prolonged and that the search was unsupported by probable cause. The trial court denied Prater's motion. After a bench trial, the trial court convicted Prater and sentenced him to five years of incarceration with four years suspended. This appeal followed.

ANALYSIS

Prater challenges the trial court's denial of his motion to suppress the evidence obtained during Deputy Craven's search of the vehicle. He contends that Deputy Craven unconstitutionally prolonged the traffic stop to search the vehicle. He otherwise argues that Deputy Craven lacked probable cause to search the vehicle.

We review the application of Fourth Amendment jurisprudence de novo, including the "assessment of whether reasonable suspicion or probable cause supported a search." *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021). In doing so, we defer to the trial court's factual findings and "independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Jones v. Commonwealth*, 277 Va. 171, 177 (2009) (quoting *McCain v. Commonwealth*, 275 Va. 546, 552 (2008)). We determine whether probable cause or reasonable suspicion exists under an objective standard and consider the ultimate question—whether the Fourth Amendment has been violated—in view of the totality of the circumstances. *McCain*, 275 Va. at 552.

We hold that Deputy Craven's traffic stop was justified by reasonable suspicion and not unconstitutionally prolonged and that his subsequent search was justified by probable cause. Each of Prater's arguments are addressed in turn.

I. Traffic Stop

Prater first argues that the trial court should have suppressed the smoking devices and residue recovered during the search of the vehicle since he contends Deputy Craven unlawfully prolonged the traffic stop. We disagree.

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." We have recognized that the Fourth Amendment "prohibits only unreasonable searches and seizures." *Thompson v. Commonwealth*, 54 Va. App. 1, 7 (2009). And the Fourth Amendment "generally requires police to obtain a search warrant" before conducting a search or seizing evidence. *See Commonwealth v. Campbell*, 294 Va. 486, 493 (2017). Indeed, "warrantless searches are per se unreasonable, subject to a few specifically established and well-delineated exceptions, and the Commonwealth has the heavy burden of establishing an exception to the warrant requirement." *Smith v. Commonwealth*, 41 Va. App. 704, 712 (2003) (quoting *Megel v. Commonwealth*, 262 Va. 531, 534 (2001)).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court "recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698 (1981). There, the Court held that "in justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Determining whether reasonable articulable suspicion exists requires that we give "due weight

. . . not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27. Reasonable articulable suspicion requires only "some minimal level of objective justification" to justify an investigatory detention, *Branham v. Commonwealth*, 283 Va. 273, 280 (2012), and is "less stringent than probable cause," *Parker v. Commonwealth*, 255 Va. 96, 104 (1998).

Traffic stops are analogous to investigatory *Terry* stops. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* (citations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Detention for a traffic stop becomes unlawful "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Myers v. Commonwealth*, 83 Va. App. 656, 668 (2025) (quoting *Rodriguez*, 575 U.S. at 354). These tasks may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. But during a traffic stop, "officers may inquire into matters unrelated to the underlying traffic infraction or the safety of the officers, as long as they 'do not measurably extend the duration of the stop.'" *Myers*, 83 Va. App. at 668 (citations omitted) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

Even so, "[i]f an officer develops independent reasonable suspicion or probable cause that an occupant has committed an additional traffic offense or crime, the officer may extend the stop for a reasonable amount of time in order to confirm or dispel that new suspicion." *Williams v. Commonwealth*, 71 Va. App. 462, 482 (2020). Thus, in *Williams*, we declined to suppress evidence seized during a traffic stop, holding that the officer appropriately developed reasonable

articulable suspicion to extend the stop for two separate offenses. *Id.* at 482-83. The officer stopped a driver observed traveling faster than the posted speed limit and failing to maintain lane control. *Id.* at 472. After stopping, the driver refused to answer questions about where his firearm was located, responding "vaguely that it was concealed." *Id.* The officer took about 20 minutes to prepare summonses on the traffic infractions and then asked the driver to step out of the car. *Id.* at 472-73. Upon doing so, the officer noticed a large revolver concealed on the driver's person and discovered cannabis during a pat-down search. *Id.* at 473. Based on these facts, we held that the officer "had reasonable suspicion to detain the [driver] to investigate further based on the suspicious circumstances surrounding the gun and the evidence of marijuana." *Id.* at 483.

Here, having stopped Mullins and Prater for a traffic infraction and due to questions about the car's registration, Deputy Craven necessarily investigated the pair's driver's licenses and the automobile's registration. *Rodriguez*, 575 U.S. at 355. The first eight minutes of the traffic stop were protracted because Mullins had no license or registration and needed to search for the car's title. "States have a 'vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles [and] that licensing, registration, and vehicle inspection requirements are being observed.'" *Myers*, 83 Va. App. at 666 (alteration in original) (quoting *Kansas v. Glover*, 589 U.S. 376, 381 (2020)). Seven minutes following his initial interaction with Mullins and Prater, Deputy Craven learned that Prater's Virginia license was invalid and that therefore no licensed driver occupied the vehicle. And five minutes later, after preparing paperwork and briefly conferring with another deputy, Deputy Craven informed Mullins and Prater they would not be permitted to drive the car as a result.

Deputy Craven developed reasonable articulable suspicion to continue the stop as he investigated the peculiarities of Mullins and Prater's circumstances. Within minutes of initiating

the traffic stop, Deputy Craven knew that (1) Mullins and Prater were seen loitering at a truck stop known for drug trafficking, (2) Mullins and Prater had come from an area in Blacksburg known for narcotics-related crimes, and (3) Prater had an orange tin close to his leg that resembled containers Deputy Craven knew to be used to hold narcotics. Coupled with the open container of alcohol, the dubious nature of Mullins's title to the vehicle, and the lack of a licensed driver, Deputy Craven had a "'a particularized and objective basis' for suspecting legal wrongdoing." *Williams*, 71 Va. App. 482-83.

*Williams* is a useful comparator. There, the driver's evasive answers prolonged the traffic stop, causing the officer to take 20 minutes to prepare summonses on the traffic infractions. *Id.* at 472-73. Deputy Craven had more than evasive answers from Mullins and Prater, providing him with multiple bases on which to investigate his reasonable articulable suspicion. He had concerns about narcotics based on the pair's whereabouts and items in the car, concerns about whether the car was stolen based on the unclear title, and concerns about whether Mullins and Prater could safely and legally drive the vehicle. That Deputy Craven was able to investigate each of these bases within 20 minutes, informing the pair thereafter that neither would be permitted to drive the car further, indicates his diligence and efficiency.

II. Search

Prater then argues the trial court erred in failing to suppress the evidence recovered during the search of the vehicle since, he asserts, Deputy Craven lacked probable cause to conduct the search. Again, we disagree.

The *Carroll*[4] doctrine—otherwise known as the "automobile exception" to the Fourth Amendment—permits officers to "search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Alvarez v. Commonwealth*,

---

[4] *See Carroll v. United States*, 267 U.S. 132 (1925).

24 Va. App. 768, 775 (1997) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)) (discussing the development of the *Carroll* doctrine). Probable cause is the quantum of proof necessary to establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Jones*, 277 Va. at 178 (quoting *United States v. Grubbs*, 547 U.S. 90, 95 (2006)). Probable cause "is not a high bar" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (first quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014); and then quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). Determining whether an officer had probable cause to perform a warrantless search of a vehicle requires that we "examine the events leading up to the [search], and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Curley v. Commonwealth*, 295 Va. 616, 622 (2018) (alteration in original) (quoting *Wesby*, 583 U.S. at 56-57).

Our Supreme Court "has consistently declined to find that probable cause can be established solely on the observation of material which can be used for legitimate purposes, even though the experience of an officer indicates that such material is often used for illegitimate purposes." *Brown v. Commonwealth*, 270 Va. 414, 420-21 (2005). "[S]uch observations must be combined with some other circumstance indicating criminal activity." *Id.* at 421. In *Harris v. Commonwealth*, 241 Va. 146, 154 (1991), the Court reversed a trial court's denial of a defendant's suppression motion where an officer claimed probable cause to search the defendant based on (1) his experience that "certain people kept their narcotics" in film canisters and (2) the report of an unreliable informant. Because "law-abiding citizens, on a daily basis, also use[d] film canisters to store film," the Court declined to hold that the officer had probable cause. *Id.* The Court likewise reversed a defendant's conviction for possession of cannabis where an officer

claimed probable cause based "purely on the premise that [he] saw . . . cigarette papers lying underneath [the defendant's] feet on the driver's side." *Matthews v. Commonwealth*, 218 Va. 1, 3 (1977) (per curiam) (first and third alterations in original) (quoting the searching officer's testimony). Holding that the officer lacked probable cause, the Court reasoned that "[a]bsent other circumstances connecting the cigarette papers" to cannabis found in a paper bag, "it would have been just as rational to believe that the bag contained tobacco, or the defendant's lunch, or any other lawful substance." *Id.* And the Court has declined to hold that an officer had probable cause to arrest a defendant who was found asleep in his car solely because he was holding a hand-rolled cigarette. *Brown*, 270 Va. at 421.

Deputy Craven's search of the vehicle was permissible under the *Carroll* doctrine since he developed probable cause to believe the vehicle contained evidence of a narcotics related crime. He developed probable cause after Mullins voluntarily showed him the glass smoking device in her possession. At that point, Deputy Craven knew that Mullins and Prater had visited an area of Blacksburg known for drug crimes and were seen at a truck stop associated with drug trafficking. That the pair were traveling in the opposite direction of their ultimate destination, were not licensed to operate the vehicle, and could not readily prove their title are circumstances compounding probability of criminal activity. Adding Mullins's possession of the glass smoking device into the calculus, a reasonable officer could have concluded there was a "substantial chance of criminal activity" afoot. *Wesby*, 583 U.S. at 57 (quoting *Gates*, 462 U.S. at 243 n.13).

Contrary to Prater's arguments, this case is distinguishable from *Harris*, *Brown*, and *Matthews*. Those cases dealt with officers who based their search or arrest on a single piece of uncorroborated evidence. Indeed, a defendant's owning a film canister is not enough, alone, to search the defendant for narcotics. *Harris*, 241 Va. at 154. Neither is a defendant's owning cigarette papers enough to search a car, nor is a defendant's holding a hand-rolled cigarette

- 10 -

enough to justify arresting him. *Matthews*, 218 Va. at 3; *Brown*, 270 Va. at 420-21. But here, Deputy Craven was not *solely* aware of the glass smoking devices in Mullins's possession. Although the glass smoking devices could have been used for legal purposes, Deputy Craven's observations about the devices were "combined with . . . other circumstance[s] indicating criminal activity." *Brown*, 270 Va. at 421. Considering they had come from an area known for drug crimes and were seen at a truck stop known for drug trafficking, Mullins and Prater with the smoking devices are distinguishably more probable to engage in criminal activity than the sleeping defendant in *Brown*, the speeding driver in *Matthews*, or the passenger in *Harris*.[5]

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed*.

---

[5] Because we hold Deputy Craven had probable cause to search the vehicle, we do not address Prater's arguments about the inapplicability of other exceptions to the warrant requirement and exclusion. *See Butcher v. Commonwealth*, 298 Va. 392, 396-97 (2020) (emphasizing that we must decide cases "on the best and narrowest grounds available" and that fact specific answers will "affect far fewer subsequent cases than a broad pronouncement on an open legal question" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

Causey, J., concurring.

Possession of lawfully obtained goods that are not themselves inherently illegal cannot and should not support probable cause. Upon the consensual search of the orange tin, Deputy Craven found two legally obtained glass pipes that had never been opened or used. Mullins purchased them legally at a shop nearby. At trial, the Commonwealth stipulated that the pipes could be purchased easily from everyday vendors, including "off of Amazon." Mullins told Deputy Craven she intended to use the pipes for smoking cannabis. Deputy Craven had no reason—other than his statement that he had "never . . . seen a glass smoking device of this nature being used for any type of marijuana or THC consumption"—to believe that Mullins was lying.

Relying on officer testimony that these pipes were *maybe* going to be used for illegal purposes, because they have been used for illegal purposes before, is the very kind of "hunch" that *Terry* warned against. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) (noting we must give "due weight . . . not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience"). If these pipes were inherently used for illegal contraband, the General Assembly would have criminalized their possession like it has for other drug paraphernalia. *See* Code § 54.1-3466.[6] Just because a defendant can creatively alter an innocuous object should not make

---

[6] Code § 54.1-3466 defines drug paraphernalia as

> (i) a hypodermic syringe, needle, or other instrument or implement or combination thereof adapted for the administration of controlled dangerous substances by hypodermic injections . . . or (ii) gelatin capsules, glassine envelopes, or any other container suitable for the packaging of individual quantities of controlled drugs . . . that reasonably indicate an intention to use any such item for the illegal manufacture, distribution, or dispensing of any such controlled drug.

- 12 -

possession of that object inherently illegal. *See Brown v. Commonwealth*, 270 Va. 414, 420-21 (2005) (noting our Supreme Court "has consistently declined to find that probable cause can be established solely on the observation of material which can be used for legitimate purposes, even though the experience of an officer indicates that such material is often used for illegitimate purposes"); *Harris v. Commonwealth*, 241 Va. 146, 154 (1991) (reversing the denial of a defendant's suppression motion where an officer claimed probable cause to search the defendant based on his experience that "certain people kept their narcotics" in film canisters).

Deputy Craven relied on factors that this and other courts have frequently warned against assigning significant weight—or treating as sole dispositive factors, in and of themselves, without other considerations in the totality of the circumstances—to establish probable cause. *See Harris*, 241 Va. at 154 (reversing based on legally obtained goods and an unreliable informant as the only two factors in the totality of circumstances); *Riley v. Commonwealth*, 13 Va. App. 494, 498 (1992) (citation omitted) ("[T]housands of citizens live and go about their legitimate day-to-day activities in . . . high crime neighborhoods. The fact that the events here at issue took place at or near an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their face." (first alteration in original)); *McCain v. Commonwealth*, 275 Va. 546, 553 (2008) ("A person's Fourth Amendment rights are not lessened simply because he or she happens to live or travel in a 'high crime' area."). *See also Brown v. Texas*, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."); *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) ("[A] 'high crime neighborhood' is not by itself enough to raise a reasonable suspicion.").

Craven determined he had probable cause to search Mullins's vehicle based solely on the appellant's (1) presence in and departure from a high crime area, and (2) possession of the

legally obtained glass pipes.  Without further proof of incriminating conduct, the majority

uncomfortably expands the *Carroll* doctrine.  *See Alvarez v. Commonwealth*, 24 Va. App. 768,

775 (1997).  High-crime areas are often those inhabited by low-income individuals living below

the poverty rate.[7]  That the appellant and Mullins came from a high-crime area and were parked

in a high-crime area does not, itself, establish a "substantial chance of criminal activity" afoot.

*District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213,

243 n.13 (1983)).  To say that it does not only flies in the face of well-established case law but

gives law enforcement officials carte blanche to stop and search the vehicles of low-income

individuals who are otherwise doing nothing wrong.  Therefore, I cannot join the majority.

However, because neither driver had a legal license to drive the vehicle, it would have

been subject to an inevitable inventory search.  Because the backpack that contained illegal

contraband would have been inevitably discovered, I ultimately agree that the appellant's

conviction must be affirmed.

---

[7] *United States v. Black*, 525 F.3d 359, 367 (4th Cir. 2008) (Gregory, J., dissenting) ("[I]t is an unfortunate reality that, in America today, high-crime areas are frequently poor.  Thus, by making much of the fact that the events of this case transpired in a 'high-crime' area . . . the majority embarks on the treacherous path of lowering the Fourth Amendment protection afforded to people in low-income areas.").  *See generally* David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 Ind. L. J. 659 (1994); C. Graif, A. S. Gladfelter, & S. A. Matthews, *Urban Poverty and Neighborhood Effects on Crime: Incorporating Spatial and Network Perspectives*, 8 *Sociology Compass* 9, 1140-1155 (2014).